**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1202
_____

UNITED STATES OF AMERICA

v.

ASYA M. RICHARDSON,
                          Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-05-cr-00440-018
District Judge: The Honorable R. Barclay Surrick

Argued July 14, 2011

Before: RENDELL, SMITH, and ROTH, *Circuit Judges*

(Filed:  September 23, 2011)

1

Ellen C. Brotman, Esq. (argued)
Karen M. Ibach, Esq.
Montgomery, McCracken, Walker & Rhoads LLP
123 South Broad Street
28th Floor
Philadelphia, PA  19109
        *Counsel for Appellant*

Michael J. Bresnick, Esq.
Richard A. Lloret, Esq.
Bernadette A. McKeon, Esq. (argued)
Kathy A. Stark, Esq.
Robert A. Zauzmer, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

_____

OPINION
_____


SMITH, *Circuit Judge.*

Alton Coles was the leader of a Philadelphia drug distribution ring responsible for selling a staggering amount of both cocaine and cocaine base (also known as crack) from 1998 to 2005.  The defendant in this appeal, Asya

2

Richardson, was Coles' fiancée. In the summer of 2005, the couple used drug money to purchase a new home. Not long after, a federal grand jury returned a series of indictments charging Coles and others with various drug trafficking and firearms offenses. Eventually the grand jury returned a fourth superseding indictment charging Richardson with money laundering. The government's theory was that, in the course of purchasing the new home, Richardson had participated in financial transactions knowing that they were designed to conceal the criminal origin of the money involved. The case proceeded to trial, and at the close of the government's case, Richardson moved for judgment of acquittal, arguing that the evidence was insufficient to support a guilty verdict. The court denied the motion and Richardson was convicted. Having reviewed the record, we conclude that the evidence is insufficient to sustain Richardson's conviction. We will therefore vacate the conviction and remand for entry of a judgment of acquittal.

## I. Facts

In addition to being a drug dealer, Coles was the CEO and owner of Take Down Records, a recording label that produced rap and hip-hop music. He also threw weekly parties at Palmer's, a nightclub located in downtown Philadelphia. Coles' drug activity generated substantial revenues, but his legitimate businesses were not profitable. Take Down Records operated at a loss, and the nightclub parties broke even (though they produced substantial cash receipts in the form of cover charges).

3

In the summer of 2002, Coles and Richardson met and began dating. The relationship blossomed into a serious romance, and by December 2002, the two were engaged. But within a year of the engagement, the couple was involved in a domestic dispute causing Richardson to flee their apartment. She went to court seeking a restraining order, and in support of her application, submitted an affidavit in which she averred (among other things) that Coles "is a big time drug hustler."[1] Despite their difficulties, Coles and Richardson eventually reconciled.

---

[1] Richardson says we cannot consider the "drug hustler" affidavit in reviewing the denial of her motion for judgment of acquittal. She asserts that the affidavit was not admitted until after the government rested, and that considering it thus would violate the rule that a decision on an acquittal motion made at the close of the government's case must be made based on the evidence then existing. *See* Fed. R. Crim. P. 29. Richardson is incorrect. Before Coles' and Richardson's joint trial, the government indicated its intent to introduce the affidavit in its case against Richardson. But it pointed out that if she did not testify (and thus was not available for cross examination), introducing the affidavit could violate Coles' confrontation rights. *See Bruton v. United States*, 391 U.S. 123 (1968). To avoid the confrontation problem, the District Court bifurcated the money-laundering counts, explaining that the jury would decide Coles' case before hearing about the affidavit and determining Richardson's guilt or innocence. So when the government announced that it was resting, its case against Richardson remained open for the purpose of introducing the affidavit.

In February 2005, Coles and Richardson decided to purchase a home together. They picked out a new house located in Mullica Hill, New Jersey. The purchase price for the home was $466,190. Coles and Richardson signed a purchase contract with the homebuilder, and Coles issued two checks from his personal checking account at Citizens Bank—one for $10,000 and another for $30,000—as a deposit towards the home's purchase price.

Coles and Richardson applied for a joint mortgage through the homebuilder's lender affiliate, NVR Mortgage Company. In the application, Coles claimed to earn $100,000 per year as the CEO of Take Down Records, and Richardson truthfully stated that she made $22,800 annually as a customer service representative at Bank of America. The mortgage application was rejected because Coles had poor credit.

NVR referred the couple to Pine Creek Mortgage Services, a "last resort" mortgage company. Pine Creek reviewed Coles' credit history and concluded that it would not be able to secure a joint mortgage for the couple. It determined, however, that Richardson had good credit and that it could probably obtain an individual mortgage in her name. At Pine Creek's suggestion, the couple removed Coles' name from the home purchase contract and Richardson completed an application for a "stated income" mortgage.[2] The application vastly overstated Richardson's

_____

[2] "Stated income" means the lender verifies the applicant's employment but not her income. The income listed on the loan

5

income. It indicated that she had three jobs and that she earned over $110,000 per year. Pine Creek nevertheless approved the application, and settlement on the house was scheduled for July 29, 2005.

Besides the $40,000 already paid to the homebuilder, the couple planned to put an additional $74,000 down on the home at settlement. In the days leading up to the settlement, Coles made a number of cash deposits into Take Down Records' business account at Citizens Bank. He later transferred the funds to his personal checking account to use towards the down payment.

The day of settlement was marked by a flurry of banking activity. At 12:08 p.m., a $9,800 cash deposit was made into Coles' and Richardson's joint checking account at PNC Bank. This deposit took place at a PNC branch located in Philadelphia. At 1:12 p.m., Coles made a $9,140 cash deposit into Take Down Records' business account. The funds were later transferred to Coles' personal checking account and used towards the down payment. Half an hour later, at the same bank branch, Coles deposited $9,200 in cash directly into his personal checking account. At 3:33 p.m., Richardson made a $9,200 cash deposit into the couple's joint checking account. This deposit was made at a PNC branch located in Stratford, New Jersey, which was near the location

application is accepted as accurate unless the underwriters determine that it is unreasonably high.

of the settlement.[3]  Finally, at 4:00 p.m., Coles made a $6,160 cash deposit into a Wachovia checking account belonging to his son.  This deposit, too, occurred at a branch located in Stratford.

The couple proceeded to the settlement, where Coles tendered three checks to cover the $74,000 outstanding on the $114,000 down payment.  The first was an official check for $49,000 purchased with money from Coles' personal checking account at Citizens Bank.  The second was a $19,000 cashier's check purchased with money from the couple's joint checking account at PNC Bank.  The third was an official check for $6,000 bought with money from Coles' son's checking account at Wachovia.  The settlement went smoothly.  Because Coles had been dropped from the home purchase contract and mortgage, the property was titled in Richardson's name only.

## II. Procedural History

On August 3, 2005, shortly after the couple had moved into the new home, a federal grand jury returned an indictment charging Coles with a single count of possession of a firearm by a convicted felon.  Three superseding indictments followed charging Coles and others with various

---

[3] We know Richardson made this deposit herself because the deposit slip evidenced her handwriting.  It is not clear whether Richardson or Coles made the earlier PNC deposit.  The bank could not locate the deposit slip and no other evidence pointed in either direction.

drug trafficking and firearms crimes. On March 22, 2006, a fourth superseding indictment was filed charging Coles and Richardson with money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), conspiracy to commit money laundering, 18 U.S.C. § 1956(h), and wire fraud, 18 U.S.C. § 1343. Coles and Richardson proceeded to trial along with four other defendants. At the close of the government's evidence, Richardson moved for a judgment of acquittal, arguing that the evidence was insufficient to support a conviction. The District Court took the matter under advisement, after which Richardson presented evidence in her own defense. The jury found Coles and Richardson guilty on the money-laundering charges but acquitted them of wire fraud. The jury also convicted Coles of drug trafficking. After the trial, the District Court issued a ruling denying Richardson's motion for judgment of acquittal. The Court sentenced Richardson to 24 months in prison. This appeal followed.

### III. Jurisdiction & Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. "We exercise plenary review over a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence." *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009). Because Richardson moved for judgment of acquittal at the close of the government's case-in-chief, and because the District Court reserved ruling on the motion, we must confine ourselves to the evidence that existed at the time the motion was made. *See* Fed. R. Crim. P. 29(b); *United States v. Tyson*, __ F.3d __, 2011 WL

8

3314942 (3d Cir. 2011); *United States v. Moore*, 504 F.3d 1345, 1347 (11th Cir. 2007) (noting that Rule 29 entitles the defendant "to a snapshot of the evidence at the point that the court reserves its ruling"). We can uphold Richardson's convictions only if the government's evidence would permit a reasonable jury to "find the essential elements of the crime[s] beyond a reasonable doubt." *Starnes*, 583 F.3d at 206. In determining whether this standard is met, we view the evidence in the light most favorable to the government, mindful that it is the jury's province (and not ours) to make credibility determinations and to assign weight to the evidence. *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010).

## IV. Analysis

We begin with the provision of the money-laundering statute under which Richardson was convicted. It provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment for not more than twenty years, or both.

9

18 U.S.C. § 1956(a)(1)(B)(i). Thus the government had the burden of establishing four elements: "(1) an actual or attempted financial transaction; (2) involving the proceeds of [a] specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) . . . knowledge that the transaction[ was] designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of [a] specified unlawful activity." *United States v. Omoruyi*, 260 F.3d 291, 294–95 (3d Cir. 2001). Richardson's sufficiency challenge focuses on the second and fourth elements.

Richardson attacks the District Court's conclusion that the financial transactions culminating in the purchase of the home involved the "proceeds of [a] specified unlawful activity." *Omoruyi*, 260 F.3d at 294. She does not dispute that drug trafficking is a "specified unlawful activity." It clearly is. *See* 18 U.S.C. § 1956(c)(7)(A). Nor does she dispute that the transactions involved at least some drug money. The government demonstrated that Coles' legitimate businesses (Take Down Records and the nightclub parties) were unprofitable, thereby permitting the jury to infer that at least some of the money used on the $114,000 down payment came from Coles' other source of income: drug trafficking. *See United States v. Stewart*, 256 F.3d 231, 249 (4th Cir. 2001) ("'Evidence that a defendant was engaged in drug trafficking and had insufficient legitimate income to produce the money used in a transaction is sufficient to establish that the money was derived from . . . drug distribution.'") (quoting

10

*United States v. Hardwell*, 80 F.3d 1471, 1483 (10th Cir. 1996)).

Richardson contends, however, that the government failed to prove that the transactions involved the "proceeds" of drug distribution. The evidence, Richardson notes, established only that the transactions involved *gross receipts* of drug distribution, and not that they involved *profits* of drug distribution. Citing the Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008), Richardson argues that the term "proceeds," as used in the money-laundering statute, means profits, not gross receipts. For its part, the government acknowledges that it failed to prove that the transactions involved profits of drug distribution. But it disagrees with Richardson's reading of *Santos*, arguing that the statute's use of the term "proceeds" means gross receipts, at least in drug trafficking cases.

Efrain Santos operated an illegal lottery for over two decades. He used the gross receipts of the lottery to pay the winners and his employees (the runners and collectors who made the scheme possible). *Id.* at 509. Based on these payments, Santos was convicted under a provision of the money-laundering statute that makes it unlawful to use criminal "proceeds" to promote illegal activity. *See* 18 U.S.C. § 1956(a)(1)(A)(i). Concluding that the statute's use of the term "proceeds" means profits, the lower courts invalidated Santos' conviction because the evidence showed only that the predicate payments involved gross receipts of the illegal lottery. *Santos v. United States*, 461 F.3d 886, 894 (7th Cir. 2006), *aff'g* 342 F. Supp. 2d 781 (N.D. Ind. 2004).

11

A splintered Supreme Court affirmed. A four-justice plurality noted that the term "proceeds" is ambiguous: dictionary definitions indicate that it can mean either profits or gross receipts. 553 U.S. at 511. Invoking the rule of lenity (under which ambiguity in a criminal statute must be construed in the defendant's favor), the plurality opined that the term "proceeds," as used in the money-laundering statute, means profits, not gross receipts. *Id.* at 514–15. The plurality also observed that adopting a receipts definition of "proceeds" would create a "merger problem" in certain types of cases:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries . . . would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, [18 U.S.C.] § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). [Indeed, t]he merger problem is not limited to lottery operators. [A]ny specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else,

12

would merge with money laundering. . . . The Government suggests no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime. Interpreting "proceeds" to mean "profits" eliminates the merger problem. [A] criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid.

*Id.* at 515–17.

Justice Stevens concurred in the judgment. He eschewed the plurality's conclusion that "proceeds" should always be construed to mean profits. *Id.* at 525 (Stevens, J., concurring in judgment) ("[T]his court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no matter how incongruous some applications may be."). He began by observing that "the legislative history of [the money-laundering statute] makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 525–26 & n.3. At the same time the legislative "history sheds no light on how to identify the proceeds of many other types of specified unlawful activities," including operating an illegal lottery. *Id.* Given the absence of helpful legislative history, Justice

13

Stevens was persuaded to concur in the judgment because applying a receipts definition in Santos' case would have run headlong into the merger problem that the plurality had identified. Congress could not have intended "such a perverse result." *Id.* at 526–28 & n.7.

Writing for the four dissenting justices, Justice Alito argued that "the term 'proceeds' in the money laundering statute means gross receipts, not net income." *Id.* at 546 (Alito, J., dissenting). Although the dissent disagreed with Justice Stevens' approach "insofar as it holds that the meaning of the term 'proceeds' varies depending on the nature of the illegal activity that produces the laundered funds," it expressly agreed with him that a receipts definition was appropriate in cases arising from "'the sale of contraband and the operation of organized crime syndicates involving such sales.'" *Id.* at 531–32. Finally, the dissent disagreed that the merger problem called for a profits definition in some or all money-laundering cases: "[T]he so-called merger problem is fundamentally a sentencing problem, and the proper remedy is a sentencing remedy." *Id.* at 547.[4]

---

[4] Congress legislatively overruled *Santos* in 2009. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1617, 1618 (2009). As amended the money-laundering statute defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, *including the gross receipts of such activity.*" *Id.* (codified at 18 U.S.C. § 1956(c)(9)) (emphasis added). The government acknowledges that the 2009 amendment does not apply retroactively to this case.

14

We believe that "proceeds" means gross receipts in the circumstances of this case. For starters, the merger problem that impelled a majority of the Supreme Court to throw out Santos' conviction is not present here. Purchasing real property is neither integral to nor an expense associated with the crime of drug trafficking. Moreover, five justices agreed in *Santos* that "proceeds" means gross receipts in cases involving the sale of drugs and other contraband. Although not binding (because four of the justices who expressed this view did not concur in the Court's judgment, *see Marks v. United States*, 430 U.S. 188, 193 (1977)), the collective view of five justices is, of course, persuasive authority. *See Rutledge v. United States*, 517 U.S. 292, 298–300, 304 (1996); *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1057 n.8 (11th Cir. 2008). Finally, our sister circuits uniformly agree that "proceeds" means receipts in the drug trafficking context—at least where (as here) there is no merger problem. *See Wilson v. Roy*, 643 F.3d 433, 437 n.3 (5th Cir. 2011) (collecting cases); *United States v. Quinones*, 635 F.3d 590, 599 (2d Cir. 2011). *Cf. United States v. Yusuf*, 536 F.3d 178, 189–90 (3d Cir. 2008) (upholding money-laundering conviction where transactions clearly involved profits, thus eliminating need to address profits-versus-receipts issue).

Richardson next argues that even if she knew drug money was used to purchase the home, there was not sufficient evidence to meet the fourth element of money laundering, *i.e.*, that she participated in financial transactions knowing that they were designed (at least in part) to conceal the nature, location, source, ownership, or control of the money. *Omoruyi*, 260 F.3d at 294–94. "In this context,

15

'design' means purpose or plan, *i.e.*, the intended aim of the" transactions. *Cuellar v. United States*, 553 U.S. 550, 563 (2008). The government need not prove that the defendant herself had the intent to conceal one of the listed attributes of the funds. It is enough to prove that the defendant knew someone else had that purpose. *United States v. Carr*, 25 F.3d 1194, 1206 (3d Cir. 1994); *United States v. Campbell*, 977 F.2d 854, 857–58 (4th Cir. 1992).

Evidence of a purpose to conceal can come in many forms, including "statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475–76 (10th Cir. 1994) (citing cases, including *United States v. Massac*, 867 F.2d 174, 178 (3d Cir. 1989)).

The government argues that Richardson had knowledge of a design to conceal based on (1) the fact that Coles made cash deposits into Take Down Records' business account only to then transfer the money to his individual checking account for personal use; (2) the irregular nature of the depositing activity that occurred on the day of settlement; and (3) the facts that Richardson lied about her income on the mortgage application and that the house was titled in

16

Richardson's name even though Coles was the "de facto" owner.

We agree with the government that funneling cash through an ostensibly legitimate business—a classic example of money laundering—is ordinarily sufficient to prove a design to conceal the nature and source of the money. *United States v. Jackson*, 935 F.2d 832, 842 (7th Cir. 1991); *United States v. Rivera-Rodriguez*, 318 F.3d 268, 277 (1st Cir. 2003). But it was Coles, not Richardson, who funneled cash through the Take Down Records account. The government adduced no evidence suggesting that Richardson participated in or knew about the transactions involving the account. This evidence thus cannot be used to establish knowledge of a design to conceal on Richardson's part.

The government is surely correct that the depositing activity that occurred on settlement day was highly suspect. As a money-laundering expert explained at trial, banks are required to file a currency transaction report when they accept a cash deposit of $10,000 or more. The report is sent to the IRS, which compares it against the depositor's tax return to check for discrepancies. The five deposits made on settlement day took place at four different bank locations, and each involved under $10,000 in cash—four just barely so. This is powerful evidence that the deposits were structured to deflect government attention, and thus to conceal the nature, source, and ownership of the funds. *See United States v. Tekle*, 329 F.3d 1108, 1114 (9th Cir. 2003); *Rivera-Rodriguez*, 318 F.3d at 272; *Garcia-Emanuel*, 14 F.3d at 1478 (design to conceal shown where asset purchase was funded by

17

bank deposits that had been structured to sidestep currency reporting requirements).

The problem the government faces, however, is that there is precious little evidence connecting Richardson to the pattern of suspicious depositing activity. True, the government established that Richardson made the $9,200 deposit at the PNC branch located in Stratford. But it offered no evidence from which to infer that Richardson participated in or was aware of the other deposits that occurred on settlement day. A single cash deposit of less than $10,000 is not sufficient to establish knowledge of a design to conceal as to the transaction as a whole.

Yet we must still consider the evidence that Richardson lied about her income on the mortgage application and allowed the house to be titled in her name even though Coles was the true owner. This evidence, according to the government, proves that Richardson intended to hide Coles' role as the source of the purchase money. The circumstances of this case indicate otherwise.

The following facts are undisputed. After deciding to purchase the home in Mullica Hill, Coles and Richardson both signed the home purchase contract, and Coles wrote two checks from his personal bank account to cover an initial $40,000 deposit. The couple submitted an application for a joint mortgage, in which Coles claimed to make $100,000 per year as the CEO of Take Down Records and Richardson stated truthfully that she earned $22,800 annually as a Bank of America employee. The application was rejected,

however, because of Coles' negative credit history. (Importantly, had the application been approved, the house would have been jointly titled in Coles' and Richardson's names.) They were then referred to a mortgage company of "last resort," which examined Coles' credit history and concluded that it would not be able to secure a joint mortgage for the couple. The company determined, however, that Richardson had good credit and that it could obtain an individual mortgage for her. It thus advised the couple to delete Coles' name from the home purchase contract and to apply for a mortgage in Richardson's name only. Richardson went along with the plan and (knowing that she could not qualify for a mortgage based on her true salary) submitted a mortgage application that vastly overstated her income. The mortgage was approved, and the house was titled in Richardson's name because she was the sole mortgagor.

These circumstances show that Richardson lied about her income and had the property titled in her name, not to hide Coles' involvement (which by then was perfectly obvious), but to get around Coles' bad credit and purchase the house as planned. *Cf. United States v. Conley*, 37 F.3d 970, 979 (3d Cir. 1994); *United States v. Sanders*, 929 F.2d 1466, 1471–73 (10th Cir. 1991). No jury could have reasonably reached a different conclusion.

Viewed as a whole, the evidence was not sufficient to establish knowledge of a design to conceal on Richardson's part. For this reason, we must vacate not only Richardson's money-laundering conviction but also her conviction for conspiracy to commit money laundering. After all, without

19

knowledge of a design to conceal the nature, source, or ownership of the money, Richardson could not have *agreed to* conceal the nature, source, or ownership of the money. *See United States v. Henry*, 325 F.3d 93, 103 (2d Cir. 2003). The government has not argued otherwise.

## V. Conclusion

For these reasons we will vacate the District Court's judgment and remand for entry of a judgment of acquittal.