**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2469
_____

UNITED STATES OF AMERICA

v.

KARLA S. PODLUCKY,
                              Appellant
_____

No. 12-2535
_____

UNITED STATES OF AMERICA

v.

GREGORY JESSE PODLUCKY, a/k/a Jesse Podlucky

Gregory Jesse Podlucky,
                              Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
Nos. 2-11-cr-00037-002 & 003
District Judge:  Hon. Alan N. Bloch
_____

Submitted Under Third Circuit LAR 34.1(a)
May 15, 2014
_____

Before: SMITH, VANASKIE, and SHWARTZ, <u>Circuit Judges</u>.

(Filed: May 27, 2014)

_____

OPINION
_____

SHWARTZ, <u>Circuit Judge</u>.

Defendants Karla Podlucky ("Karla") and her son Gregory Jesse Podlucky

("Jesse") appeal from their judgments of conviction and sentence for money laundering.[1]

For the reasons set forth below, we will affirm.

## I. Factual and Procedural History

As we write primarily for the parties, we set forth only those facts necessary to our

analysis. In 1998, Greg Podlucky ("Greg"), Karla's husband and Jesse's father,

implemented a scheme to falsely inflate the sales figures and revenues of his company,

LeNature Inc. ("LNI"),[2] that bilked LNI's investors and banks of more than $628

million.[3] Jesse began working at LNI in 2003 as a bookkeeper, and his responsibilities

included depositing every check LNI received as well as managing the bookkeeping for

LNI's tea subsidiary.[4]

Greg and Karla's 2000-2006 joint tax returns revealed available funds—the

difference between their adjusted gross income and expenditures disclosed on the tax

returns—of approximately $200,000 per year. During that time period, the Podluckys

[1] Karla and Jesse each also separately appealed an order denying the motion of Jesse's counsel to withdraw. They have not opposed the motion to dismiss those appeals.

[2] LNI made bottled water and other beverages.

[3] For instance, in 2002, LNI told banks and investors that its revenue was $135 million, when in fact its sales totaled only $1.2 million that year.

[4] The tea subsidiary was at the heart of the LNI fraud. From 2000 through 2006, it reported about $240 million in sales, but its actual revenue during that time period was closer to $84,000.

nevertheless spent lavishly, flying by private jet, building a 25,000 square foot mansion,[5] and spending more than $33 million on jewelry. Approximately $26 million worth of jewelry was purchased with funds directly from LNI corporate accounts. The remainder of the jewelry purchases were paid for by a check from an account in the name of the Melissa Morgan Capital Corporation[6] (the "Melissa account"), which Greg and Karla formed, for which Karla was the secretary, and which was funded entirely by LNI. Karla and Jesse were the only individuals authorized to write checks on the Melissa account.

LNI was placed into custodianship by a court in late 2006, and was forced into bankruptcy by its creditors on November 1, 2006. The custodian discovered a secret room at LNI's headquarters, which contained safes holding extravagant jewelry purchased with LNI funds.[7] Absent from the safe was other jewelry, including diamond earrings weighing 4.04 and 4.08 carats apiece and worth more than $500,000, a diamond ring Karla wore worth over $241,000, and seven Kashmir sapphires collectively worth more than $2 million.[8] Days after LNI entered bankruptcy, Karla gave the diamond ring

---

[5] Karla insisted at trial that the mansion, built adjacent to her and Greg's private home in Ligonier, Pennsylvania, was a "training center" for LNI salespeople. App. 1579-80. The architectural plans for the mansion, however, indicated that the building was a "private residence," App. 1579-81, and it was built in an area zoned only for residential structures. Moreover, Karla was involved in the architectural details, which included specifications for "Karla's closet," designed to hold her jewelry, and the "boys['] bedrooms." Supp. App. 481. The title for the property was initially in Greg's and Karla's names, even though it was funded entirely by LNI. In December 2006, Greg and Karla transferred the mansion to Jesse and his two brothers, who were then ages 25, 15, and 13, purportedly because Greg and Karla owed the three sons $56 million. Jesse testified at trial that there was no such debt.

[6] The corporation, which the Podluckys named after their deceased daughter, never filed tax returns, and there is no evidence it conducted any business.

[7] In September 2007, the Government filed a civil complaint against Greg and Karla seeking forfeiture of the jewelry recovered from LNI. Karla and Greg waived their right to contest the forfeiture.

[8] The diamond earrings and some of the sapphires were purchased with funds drawn from the Melissa account by checks Karla signed.

and earrings to Greg, and he instructed the jeweler holding the sapphires to mail them to his attorney. Greg later retrieved the sapphires from the attorney's office.

In January 2007, the Podluckys sought to dispose of other jewelry, specifically more than 23 pounds of Karla's gold jewelry and 1.5 pounds of platinum jewelry, by mailing it to a cash-for-jewelry company. The Government seized these packages and thereafter searched the Podluckys' house. The Government recovered additional jewelry that corresponded with LNI records but did not find the diamond ring, diamond earrings, or the Kashmir sapphires.

Three days after their home was searched, Karla and Greg contacted an attorney named Robert Williams to create trusts to liquidate the diamond ring, diamond earrings, and Kashmir sapphires. Karla and Greg then formed the Maranatha Trust, of which Karla was named the sole beneficiary. As described below, proceeds from the sale of jewelry were ultimately placed in the Maranatha Trust accounts.

In the meantime, in March 2008, Karla and Greg sold the diamond ring and diamond earrings, valued at more than $741,000, to Karla's parents for only $8,800. Two weeks later, Jesse wrote three checks to Karla's parents totaling exactly $8,800.

In April 2008, the Government filed criminal charges arising from the fraud at LNI, including charges against Tammy Andreycak, LNI's Director of Accounting. That same month, Karla learned both that Andreycak had pleaded guilty for her role in the fraud and that Greg was under investigation.

In September 2008, Greg registered a company called Green Special Advisors, LLC ("Green Advisors") in Nevada, purportedly so that Greg and Jesse could serve as

4

consultants in the beverage industry, but neither Greg nor Jesse earned any income from the company. That same month, Karla created the Twilight Palm Canyon Asset Management Trust (the "Twilight Trust"), naming Jesse and his two brothers as beneficiaries. Karla used 297 Sunrise Lane in Ligonier, Pennsylvania as the Twilight Trust's address, which was in fact the address of an empty lot on a street adjacent to the Podluckys' home at 345 Cobblestone Lane. After the Twilight Trust was established, Karla's parents signed a "deed of gift" purporting to place in the trust the diamond earrings and ring that they had supposedly purchased from Karla and Greg for $8,800 in March 2008. Jesse then opened brokerage and checking accounts for the Twilight Trust, using the Sunrise Lane address, although the Cobblestone Lane address was printed on the actual checks.

In August 2009, Williams, the attorney who set up the Maranatha Trust, contacted Sotheby's Auction House in New York and asked for help selling the Twilight Trust jewelry. Subsequently, Williams, Greg, and Jesse met with the Sotheby's representative and showed him the diamond earrings and ring. Aware that Greg was under investigation, Sotheby's sought additional information about the Twilight Trust jewelry, and received from the Podluckys' lawyer the deed of gift purporting to transfer the jewelry to the Twilight Trust. In addition, Jesse provided Sotheby's with a "historical background" document, which falsely stated that the diamond jewelry had belonged to Karla's family "since the early 1900s." App. 1691-93; Supp. App. 100. Relying on these representations, Sotheby's agreed to auction the items and wired a $99,000 advance to

5

the Twilight Trust checking account in September 2009. Jesse later delivered the Kashmir sapphires to Sotheby's for auction.

Greg was indicted in September 2009 for his role in the LNI fraud. Thereafter, Sotheby's sold the diamond ring, diamond earrings, and sapphires and wired the proceeds—totaling more than $2.8 million—to the Twilight Trust brokerage account Jesse established. Among other things, those funds were later used to pay down $300,000 in debt on the Podluckys' personal credit cards. The remaining funds were used primarily to pay for the Podluckys' personal expenses, including Greg's legal bills,[9] either directly or after passing through additional bank accounts.

In June 2010, Karla opened a checking account for the Maranatha Trust using the address of Williams's law firm, even though Williams died in 2009. Into that account she deposited $200,000 from the Twilight Trust accounts. Also in 2010, Jesse and a partner formed a company called Morganics USA, LLC ("Morganics"), for which they opened two accounts. The accounts were initially funded with $150,000, which consisted of $15,000 from the partner, $30,000 from Jesse, and $105,000 from an "angel investor" who was in fact Karla. The entirety of Jesse and Karla's share—$135,000—came directly from the Maranatha Trust checking account. Because the Maranatha Trust account was funded by the Twilight Trust accounts, which in turn were funded by the sale of the jewelry purchased with LNI funds, Jesse and Karla's contribution to Morganics consisted entirely of LNI money.

---

[9] Greg's legal bills were paid by three checks signed by Jesse drawn on the Twilight Trust account and one check signed by Karla drawn on the Green Advisors account. Supp. App. 442-43, App. 1069, 1344-45.

In June 2010, Karla opened a checking account for Green Advisors, for which she was the lone signatory, using the fictitious Sunrise Lane address. Karla funded the account with $55,000 from the Maranatha Trust account and $250,000 from the Twilight Trust Accounts. Greg later ordered $11,000 of patio furniture, ostensibly for Green Advisors, using the name "Greg Green" and the fictitious Sunrise Lane address, which Karla retrieved on June 8, 2010, paying with a Discover Card. Karla then paid the Discover Card bill with funds from the Twilight Trust account.

On Friday, October 8, 2010, the Government filed a second forfeiture action to seize the approximately $1.3 million remaining in the Twilight Trust accounts. On October 12, 2010—the next day banks were open—Greg opened a second Green Advisors account, naming Karla as the secretary for the business, and Karla transferred all of the remaining money from the original Green Advisors account to the new account. Karla and Greg then spent almost all of the remaining money, paying a year's worth of mortgage and utilities payments and paying down personal debts. That same day, Jesse closed one of the Morganics accounts and transferred the balance to the remaining account. He then used the remaining Morganics account funds to acquire cashier's checks for personal expenses and to pay a debt consolidation company.

In December 2010, Karla had the address of the Podlucky home legally changed from the Cobblestone Lane address to the Sunrise Lane address. In her explanation for the change, she wrote "always had this address," Supp. App. 531, even though the Podluckys had used the Cobblestone address on documentation up until the LNI fraud was disclosed and the postal service had returned as undeliverable mail sent to the

7

Sunrise Lane address because "there was no such number." App. 1074. Karla, Jesse, and Greg then had their drivers' licenses reissued, with their home address changed to Sunrise Lane.

On February 8, 2011, a grand jury returned a five-count indictment charging Greg, Karla, and Jesse with conspiracy to commit and committing money laundering.[10] Greg pled guilty to conspiring to launder money. Karla and Jesse were tried jointly, and both testified. Among other things, they sought to demonstrate that they had been misled by Greg to believe that the jewelry that ultimately funded the various trusts and accounts had been purchased with $5 million from a stock sale. The jury found Karla guilty of Counts Three, Four, and Five and Jesse guilty of all counts. The District Court sentenced Karla and Jesse to 51 months' and 108 months' imprisonment, respectively. Both appeal their convictions, and contend that the evidence was insufficient to support their money laundering convictions. Jesse also challenges the District Court's order denying his request to show the jury a video that he argues supports his belief that the company was

---

[10] Count One charged that from October 26, 2006 through December 31, 2010, Greg, Karla, and Jesse conspired to commit money laundering by selling jewelry obtained with LNI funds in a series of transactions and placing the proceeds in separate legal entities to conceal their source, all in violation of 18 U.S.C. § 1956(h). Count Two alleged that on January 1, 2010, Greg, Karla, and Jesse engaged in a financial transaction with the proceeds of unlawful activity designed to conceal the location, source, ownership, or control of the proceeds by depositing $100,000 drawn by Jesse on the account of Twilight Trust into the account of Greg's lawyer's firm, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i). Count Three charged that on June 8, 2010, Greg, Jesse, and Karla engaged in a monetary transaction in criminally derived property with a value greater than $10,000 by using their Discover Card to pay $11,336.70 for patio furniture, in violation of 18 U.S.C. § 1957(a). Count Four charged that on September 1, 2010, Greg, Jesse, and Karla conducted a financial transaction designed to conceal the location, source, ownership, or control of the proceeds of criminal activity by causing a $100,000 check drawn by Karla on the Green Advisors account to be deposited into the account of Greg's lawyer's firm, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Count Five charged that on October 18, 2010, Greg, Jesse, and Karla engaged in a monetary transaction involving criminally derived property with a value greater than $10,000 by withdrawing funds in the amount of $80,021.79 from the Morganics account at First Niagara Bank to purchase eleven cashier's checks, in violation of 18 U.S.C. § 1957(a). Finally, Counts Two through Five—the substantive money laundering counts—also charged each defendant with aiding and abetting the money laundering transactions, in violation of 18 U.S.C. § 2.

8

profitable in 2005.  Finally, Karla argues that the District Court erred when it enhanced her sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

## II.  Discussion[11]

### A.  Sufficiency of the Evidence

We apply a "particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence."  United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).  We view the evidence in the light most favorable to the government, and we "will sustain the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Id. (quoting United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996)).  An appellant raising a sufficiency of the evidence challenge thus bears "a very heavy burden."  Id. (quotation marks omitted).

### 1.  Karla Podlucky

Karla raises three challenges to her convictions on Counts Three (the patio furniture purchase),[12] Four (payments to Greg's lawyer),[13] and Five (the withdrawal of

---

[11] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

[12] To prove a violation of § 1957(a), charged in Counts Three and Five, the Government was required to show:

> (1) the defendant engage[d] or attempt[ed] to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity.

United States v. Sokolow, 91 F.3d 396, 408 (3d Cir. 1996) (quotation marks and citation omitted).

[13] To establish a violation of § 1956(a)(1)(B)(i), charged in Counts Two and Four, the Government was required to show that the defendant conducted:

> (1) an actual or attempted financial transaction; (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) . . . knowledge that the transactions were designed in whole or in part to conceal the nature,

9

money, in the form of cashier's checks, from the Morganics accounts).[14] She argues that (1) the evidence was insufficient to establish that she knew that the funds used in the transactions were the proceeds of the unlawful activity; (2) the evidence was insufficient to show that the withdrawal from the Green Advisors account to pay Greg's lawyer, charged in Count Four, was designed to conceal the source of the funds; and (3) there was insufficient evidence that she participated at all in the Morganics account transaction alleged in Count Five.

### a. Knowledge of the Unlawful Activity (Counts Three, Four, and Five)

There was sufficient evidence from which the jury could infer Karla's knowledge that the jewelry, which funded the money laundering transactions, was purchased with proceeds of unlawful activity and not from a purported $5 million stock buyback, particularly in light of the Government's evidence that no such buyback occurred and the fact that no such proceeds were reflected in the joint tax returns Karla and Greg filed. Moreover, the fact that the sums of money Karla spent on the jewelry between 2001 and 2006 vastly exceeded the amount of available funds she and Greg had, as reflected in those joint tax returns supports the inference that Karla was aware that the source of the

_____

location, source, ownership, or control of the proceeds of specified unlawful activity.

United States v. Omoruyi, 260 F.3d 291, 294-95 (3d Cir. 2001).

[14]The conduct charged in Counts Two through Five—the substantive money laundering counts—could also be established by proving aiding and abetting liability, which required that the Government prove the defendant "in some way associated himself [or herself] with the venture, that he [or she] participated in it as something that he [or she] wished to bring about, [and] that he [or she] sought by his [or her] action to make it succeed." United States v. Jenkins, 90 F.3d 814, 821 (3d Cir. 1996) (quotation marks omitted).

money was illegal.[15]  That inference is further supported by the fact that Karla signed the checks that were used to purchase the jewelry, and those checks were drawn on the Melissa account, which in turn belonged to a corporation for which Karla was the secretary and which was funded entirely by LNI and existed solely to finance the purchase of jewelry.

Furthermore, even if the jury believed that the fraudulent activity at LNI was not obvious to Karla at the time of the jewelry purchases, the nature and extent of the LNI fraud was made patent by the time of the 2010 transactions for which Karla was convicted.  For example, in September 2007, the Government filed a forfeiture action, which Greg and Karla did not contest, that alleged that jewelry found at LNI had been obtained fraudulently.  Moreover, Karla testified that in April 2008—two years before the transactions—she became aware that Tammy Andreycak, Greg's co-conspirator, had pleaded guilty to her role in the LNI fraud.

Finally, the nature of the transactions themselves provided a basis for a reasonable jury to conclude Karla knew that the funds were illegal proceeds.  The funds were used to pay personal expenses but none of the funds were placed in personal accounts.  Instead, the funds passed through a complex series of trust and corporate accounts[16] registered to

---

[15] The mansion, which Karla helped design for her family's personal use but which she insisted at trial was a "training center" for LNI, App. 1579-80, provided additional circumstantial evidence from which the jury could infer that Karla knew that LNI's money was paying for the Podluckys' purely personal expenditures.

[16] Relying on United States v. Richardson, 658 F.3d 333 (3d Cir. 2011), Karla argues that there is "a void of evidence" linking her to the deposits made by Sotheby's into the Twilight Trust accounts.  Karla Appellant Br. 33-34.  In Richardson, the only evidence of the defendant's knowledge of suspicious depositing activity was a single cash deposit of $9,200, which we held "is not sufficient to establish knowledge of a design to conceal as to the transaction as a whole."  658 F.3d at 341.  Here, by contrast, there was substantial evidence on which the jury could rely to infer Karla knew of the Twilight Trust transactions.  While she is not connected to the deposits themselves, she helped facilitate them: she signed the checks for some of the jewelry; she (along with Greg) established the

11

the fictitious Sunrise Lane address, which Karla later tried to claim had always been her address.

Viewing the evidence in the light most favorable to the Government, the jury had sufficient evidence to infer Karla knew the funds were ill-gotten and reject her testimony to the contrary.

### b. Design to Conceal (Count Four)

Karla next contends that there is insufficient evidence to establish that she knew that the $100,000 check she wrote on the Green Advisors account was designed to conceal the source of the funds. Intent to conceal can be shown by circumstantial evidence, including "unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves [culminating] in the transaction; or expert testimony on practices of criminals." Richardson, 658 F.3d at 340 (quotation marks omitted).

Karla maintains that the payment to Greg's attorney was not designed to conceal the source of the funds, but rather was the "mere transfer and spending of funds." Karla Appellant Br. 40. The Government introduced substantial evidence to the contrary. First, there was evidence that Green Advisors itself was a sham, as it never paid any money to Greg or Jesse. Second, the Green Advisors account, which Karla opened, used

Twilight Trust; she was present when her parents, who had acquired the jewelry in a sham transaction, met with her lawyer to deed the jewelry to the Twilight Trust; and she took the proceeds from the Twilight Trust to fund her Maranatha Trust accounts.

the fictitious Sunrise Lane address. Third, Karla moved the funds through multiple entities: from the Twilight Trust account (registered to the fictitious Sunrise Lane address) to the Maranatha Trust account (registered at the address of her deceased attorney) before placing them in the Green Advisors account. Finally, the funds from the Twilight Trust came from Sotheby's sale of jewelry that was supposedly granted to the Trust by Karla's parents, who had acquired the jewelry from Greg and Karla in a transaction that the jury could infer was a sham since they were completely reimbursed by Jesse.

In sum, the funds to pay Greg's lawyer moved through multiple accounts, all controlled by Karla but not registered to her personally or to her true address, and payment was then made from the account, registered to a fictitious address, of a company that the jury could reasonably conclude was a sham. From this evidence, the jury could infer that Karla's payment was designed to conceal the true source of the funds.

### c. Participation in the Morganics Transaction (Count Five)

Karla also contends that there was insufficient evidence connecting her to the transaction charged in Count Five, which consisted of using cashier's checks to empty the Morganics account at First Niagara Bank. She argues that there was no evidence linking her to the business of Morganics or to the withdrawal of funds from the account. Although Jesse withdrew the funds, a rational jury could conclude that she "in some way associated [herself] with the [transaction], that [she] participated in it as something that [she] wished to bring about, [and] that [she] sought by [her] action to make it succeed." Jenkins, 90 F.3d at 821 (3d Cir. 1996) (quotation marks omitted).

13

The Morganics account was funded by $15,000 from Jesse's partner and $135,000 from the Twilight Trusts, which passed through the Maranatha Trust accounts. As with the Green Advisors transaction, the funds used in the Morganics transaction originated with the sham jewelry transaction with Karla's parents and then passed through accounts that Karla established and registered to a fictitious address. Moreover, Jesse testified that he and Karla decided to keep her involvement in the transaction secret, which they accomplished by telling Jesse's partner that Jesse had contributed $30,000 and that an unnamed "angel investor" had provided the remaining $105,000, when in fact the entire contribution came from Karla's Maranatha Trust accounts. App. 1146-47. Additionally, on the same day Jesse was emptying the Morganics account—October, 12, 2010, which was the next business day after the second forfeiture action was filed—Karla was emptying the Green Advisors account, providing circumstantial evidence of Karla's intent and a coordinated scheme to launder the funds. In short, the jury could infer that Karla was liable for aiding and abetting the Morganics transaction, as there was evidence that Karla took action to make the transaction succeed by surreptitiously funding the account, which Jesse then emptied for personal expenses.

Because Karla has not carried her burden of showing that no reasonable trier of fact could convict her on these three counts, we will affirm the judgment of conviction.

14

## 2. Jesse Podlucky (Counts One through Five)

Jesse contends that the evidence is insufficient to convict him of conspiracy to commit money laundering,[17] as well as the substantive money laundering counts, because he presented evidence at trial that the funds to buy the jewelry came from a legitimate source, namely a stock repurchase, and that he therefore "had a legitimate belief" that the sale of jewelry "would provide lawful proceeds." Jesse Appellant Br. 29. He also argues that the Government failed to prove his intent to conceal the proceeds as charged in Counts Two and Four.

Jesse argues that his own "uncontradicted testimony" established that he "reasonably believed that his father had exercised his [right to a] stock repurchase," and that Greg had bought the jewelry with money from the repurchase. Jesse Appellant Br. 44. The jury evidently did not believe Jesse's testimony,[18] and the Government introduced sufficient evidence for them to conclude that Jesse knew that the jewelry was purchased with the proceeds of the LNI fraud.

---

[17] To prove conspiracy to commit money laundering, under § 1956(h), the Government was required to show:

> (1) the conspiracy, agreement, or understanding to commit money laundering was formed, reached, or entered into by two or more persons; (2) at some time during the existence or life of the conspiracy, agreement, or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement; and (3) at some time during the existence or life of the conspiracy, agreement, or understanding, the defendant knew the purpose of the agreement, and then deliberately joined the conspiracy, agreement or understanding.

United States v. Conley, 37 F.3d 970, 976-77 (3d Cir. 1994).

[18] Among other things, the jury may have relied on the fact that Jesse was unable to explain whether he believed the stock sold belonged to him or his father.

First, Jesse helped ensure Sotheby's sale of the jewelry by preparing a document claiming that the jewelry had belonged to Karla's family "dating back to the early 1900s." Supp. App. 100. That document was a fabrication, as the jewelry had been purchased with LNI funds and "sold" to Karla's parents by Greg and Karla for only $8,800 and, shortly after the purported sale, Jesse wrote three checks to Karla's parents totaling exactly $8,800. There was therefore ample evidence that Jesse was aware that the money that flowed into the Twilight Trust from Sotheby's sale of the jewelry derived from the LNI fraud, and that he participated in a conspiracy to obscure that origin, as charged in Count One. Those funds then flowed to other accounts, culminating in the transactions charged in Counts Two through Five.

Second, the evidence also demonstrated that Jesse, like Karla, took significant steps to further conceal the source of the funds that he spent. Jesse opened accounts for the Twilight Trust using the fictitious Sunrise Lane address. He then used those funds to pay Greg's lawyer, as charged in Count Two. He also used his authority over the Twilight Trust accounts to fund Karla's Maranatha Trust account and the Green Advisors account that were in turn used in the patio furniture and attorney fee transactions charged in Counts Three and Four, respectively, which supports the jury's verdict based on aiding and abetting liability.[19] Finally, he worked with Karla to obscure the funding source of the Morganics account by misleading his partner. He then withdrew the funds in eleven cashier's checks, which he used for his personal expenses, as charged in Count Five.

_____

[19] As in Karla's case, Jesse's use of false addresses and the web of accounts is sufficient to show a design to conceal. See Richardson, 658 F.3d at 340.

In short, there was evidence that Jesse was involved with the money laundering scheme from its inception, and that he had a role in each charged transaction.

### B. District Court's Exclusion of the Video Offered by Jesse Podlucky

Jesse also challenges the District Court's exclusion of the video he sought to introduce in support of his claim that he believed that the jewelry was purchased with the legitimate proceeds of a stock repurchase. The video depicted a 2005 television news report about LNI's construction of a facility in Phoenix, Arizona, and Jesse contended that this report contributed to his belief that LNI had been in a strong financial position, making plausible a stock repurchase. The District Court declined to permit the introduction of the video based on Fed. R. Evid. 403 because the news report occurred in 2005 and the money laundering conduct for which Jesse was charged occurred years later, after LNI entered bankruptcy in 2006 and the fraud became public, so that Jesse had to have been aware of LNI's unprofitability by the time of the charged conduct.

We review the District Court's decision to exclude the evidence "for abuse of discretion, and such discretion is construed especially broadly in the context of Rule 403." United States v. Kemp, 500 F.3d 257, 295 (3d Cir. 2007) (quotation marks omitted). To reverse, "a district court's analysis and resulting conclusion must be arbitrary or irrational." United States v. Universal Rehab. Servs. (PA), Inc., 205 F.3d 657, 665 (3d Cir. 2000) (en banc) (internal quotation marks omitted).

Here, the evidence was cumulative of the testimony of both Karla and Jesse that LNI seemed to be a successful company until it was placed in custodianship in 2006. It was also cumulative of Jesse's testimony that his father showed him the stock repurchase

agreement in 2008.  Further, the video was not relevant to Jesse's state of mind at the time of the transactions at issue, as they occurred well after the video.  The reasonableness of a belief that LNI was successful after 2005 is belied by the custodianship and bankruptcy that began in 2006, the fraud that was revealed in the forfeiture action filed in 2007, and the indictment and guilty plea of Tammy Andreycak in early 2008.

Because the video was irrelevant to Jesse's state of mind when the transactions occurred, we cannot say that the District Court's decision to exclude the video was irrational or arbitrary.  We will therefore affirm the judgment of conviction.

### C.  The District Court's Enhancement of Karla Podlucky's Sentence

Karla also contends that the District Court erred when it enhanced her sentence pursuant to U.S.S.G. § 3C1.1 based on its finding that she had obstructed justice.  The District Court applied the enhancement because it found that she had changed her home address from Cobblestone Lane to Sunrise Lane to impede the Government's investigation and prosecution.  Karla argues that the District Court impermissibly relied on the conduct of Greg Podlucky when it made its finding.  We review a District Court's factual findings, as well as its application of the Guidelines to those facts, for clear error.[20]  United States v. Richards, 674 F.3d 215, 220 (3d Cir. 2012).

Here, the District Court focused on Karla's conduct and did not err when it found that she changed her address to thwart the investigation.  Karla used the Sunrise Lane

---

[20] "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (alterations and citations omitted).

18

address to establish the Twilight Trust and certain checking accounts, through which she, Greg, and Jesse laundered the LNI proceeds. After the Government filed the second forfeiture action in 2010, revealing that it was aware of the Twilight Trust and related accounts, Karla changed her legal address to Sunrise Lane and obtained a driver's license reflecting the changed address. Karla's statement on the application that she "always had [the Sunrise Lane] address," Supp App. 531, was not true, as the Podluckys had consistently used the Cobblestone Lane address before they began their money laundering scheme. Further, as the District Court observed, "[t]he timing of the action," immediately after Karla learned that the Government sought the Twilight Trust assets, "demonstrates that it was designed to thwart the Government's investigation into the instant case." App. 1968.

Thus, there was ample evidence to support the District Court's conclusion that Karla's change of the address was an attempt to evade detection. We will therefore affirm the District Court's judgment of sentence.

### III. Conclusion

For the reasons set forth above, we will affirm the judgments of conviction and sentence.