# United States Tax Court

T.C. Memo. 2022-45

GREGORY J. PODLUCKY AND KARLA S. PODLUCKY,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 453-17.                                    Filed May 5, 2022.

————

Gregory J. Podlucky and Karla S. Podlucky, pro sese.

*Kirsten E. Brimer*, *Harry J. Negro*, *Douglas C. Rennie*, *Chelsey M. Pearson*, *Francesca M. Ugolini*, *Curtis C. Pett*, *Ronald S. Collins*, and *Laurel B. Stout*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: During 2003–2006 petitioner Gregory Podlucky extracted more than $30 million from a corporation he controlled to purchase for himself and his wife luxury jewelry and a mansion, among other things. In 2009 petitioners were indicted in the U.S. District Court for the Western District of Pennsylvania for crimes including mail fraud, money laundering, and tax evasion. Both were convicted and sentenced to lengthy terms of imprisonment.

After petitioners were remanded to custody, the Internal Revenue Service (IRS or respondent) completed a civil examination of their 2003–2006 tax returns. In 2016 the IRS determined deficiencies of $476,123, $1,189,550, $1,091,254, and $2,024,775, respectively, plus civil fraud penalties (against Mr. Podlucky only) of $357,092, $892,163, $818,441, and $1,518,581, respectively. Petitioners dispute these determinations and contend that Mrs. Podlucky is entitled to relief from joint and

**[\*2]** several liability under section 6015.[1]  For the reasons that follow, we sustain the IRS's deficiency and penalty determinations and hold that Mrs. Podlucky is not entitled to "innocent spouse" relief.

## FINDINGS OF FACT

The following facts are drawn from the pleadings, the trial testimony, documents admitted into evidence at trial, and a stipulation of facts with attached exhibits admitted into evidence under Rule 91(f). Petitioners Gregory Podlucky (Greg) and Karla Podlucky (Karla), husband and wife, filed joint returns for the four tax years at issue.  When they filed the petition, Greg was incarcerated in Fort Dix, New Jersey, and Karla resided in Newhall, California.

## I.  *Background*

Greg is a certified public accountant.  He graduated from West Virginia University in 1984 with a degree in accounting and finance. After graduating he worked for his father, who owned a brewing company in Pennsylvania.

In the 1990s Greg started his own beverage bottling business, originally called Genesis, Inc.  In 1995 he changed the company's name to Global Beverage Systems, Inc., and expanded its product line.  In 2002 he changed its name to Le-Nature's, Inc. (LNI).  LNI, a C corporation, specialized in bottling waters, teas, and similar beverages.

At all relevant times Greg was LNI's chief executive officer (CEO), majority shareholder, and chairman of the board.  He headquartered LNI in Latrobe, Pennsylvania, about 12 miles from Ligonier, Pennsylvania, where he and Karla lived.  He formed a subsidiary called Tea Systems International to sell tea concentrate to other bottlers.  LNI had accounts at Merrill Lynch and various banks, and these financial records were introduced into evidence at trial.

During its early years LNI appears to have been successful.  It grew rapidly, employing roughly 100 people by 2004.  Greg hired his brother to serve as the company's chief operating officer.  Under Greg's

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*3] leadership LNI reported steadily rising year-over-year revenues and profits.

During the tax years at issue LNI had two minority shareholders, Smith Whiley & Co. (Smith Whiley) and George K. Baum Capital Partners (Baum). Both were private equity funds. Venita Fields, Smith Whiley's managing director, had learned about LNI in 1999 from an investment bank. She was interested in "alternative beverages" as an investment concept and believed that LNI might be attractive. On her recommendation Smith Whiley in 2000 invested $10 million in LNI.

In connection with this investment Smith Whiley was given one seat on LNI's board, which was occupied by Ms. Fields. Smith Whiley purchased another $5 million of LNI stock in 2002. It was then given a second seat on LNI's board, which was occupied by Ruth Huet. Both testified at trial of this case. Baum, the other minority shareholder, held the third outside seat on LNI's board. LNI also secured hundreds of millions of dollars in debt financing from larger financial institutions, including AIG, Wachovia, Wells Fargo, and Merrill Lynch.

When recommending the initial investment in LNI, Ms. Fields envisioned a holding period of about six years. In 2005, as that period neared its end, Smith Whiley considered cashing out its investment. Ms. Fields believed, on the basis of quarterly and annual reports furnished to her, that LNI had enjoyed a "sharp incline in revenues and profits." Sale of the LNI stock, she thought, would generate a significant return on Smith Whiley's investment.

Ms. Fields coordinated with Baum, the other minority shareholder, to investigate possible sale of their stock (or of the company). They hired an investment banker to estimate LNI's value and look for potential buyers. Ms. Fields received expressions of interest from several buyers, but no deal ever closed. Ms. Fields testified that Greg "sabotaged" the negotiations by refusing to give potential buyers access to LNI's accounting records. Rather than sell the company, Greg insisted on expanding its operations by building a production facility in Florida, but he never received board authorization to do that.

In May 2006 the minority shareholders sued LNI in the Delaware Chancery Court. *See George K. Baum Cap. Partners, LP v. Le-Nature's, Inc.*, No. CA2158 (Del. Ch. filed May 16, 2006). They alleged that Greg had intentionally obstructed their attempts to sell their stock by blocking access to LNI's books and records. A few months later AIG, one of

[*4] LNI's lenders, informed the minority shareholders of its belief that Greg had forged documents in order to secure loans and had used loan proceeds to purchase millions of dollars of assets for himself and his wife.

After receiving this information, the chancery court in October 2006 removed Greg as CEO and appointed a custodian to take control of LNI. Salvatore LoBiondo, the custodian's financial restructuring specialist, was directed to manage LNI on an interim basis and review its financial records to determine whether it could continue to operate. Mr. LoBiondo quickly discovered that LNI had maintained two sets of books: one set that reported actual sales and profits, and another that reported fictitious sales and profits. The gap between the two sets of figures was huge: In one year LNI reported roughly $300 million in revenue, but its actual revenues were closer to $30 million.

These findings prompted LNI's creditors to file an involuntary bankruptcy petition against it in the U.S. Bankruptcy Court for the Western District of Pennsylvania. The bankruptcy court granted that petition and directed Mr. LoBiondo to continue to manage LNI. By the end of November 2006 Mr. LoBiondo concluded that LNI could not be resuscitated. The company's Latrobe and Arizona facilities were closed, and it ceased operations. The minority shareholders lost virtually all of their investments, and LNI's lenders lost more than $600 million.

## II.   *Criminal Investigation*

In December 2006 the Department of Justice, the IRS Criminal Investigation Division (CID), and the Postal Inspection Service began investigating petitioners for criminal wrongdoing. The Government believed that Greg had supplied LNI's lenders and minority shareholders with false financial documents to induce them to invest in LNI. And the Government believed that Greg had extracted funds from LNI, through a money laundering scheme, to purchase luxury goods for himself and his wife.

CID uncovered evidence that Greg had directed one of his employees to keep accounting records using two different software systems: One system was used to record LNI's actual results, and the other was used to create fictitious (and much more favorable) results. Greg told this employee "what he wanted LNI's sales to be" and instructed her to create fake invoices to support the fictitious sales numbers. This employee, who also pleaded guilty to criminal charges, helped Greg

**[*5]** fabricate checks, create fictitious banking records, and generate false financial statements for LNI. The Government found on Greg's computer "templates" that he used to photoshop checks and bank statements. Greg used these bogus documents to induce lenders and potential investors to advance funds to the business.

The investigation also revealed that Greg had siphoned money out of LNI by writing checks on LNI's accounts and by wiring funds from those accounts to two shell companies he controlled: GVS Services (GVS) and Melissa Morgan Capital Corp. (2MC), the latter being named after his daughter.[2] There is no evidence that GVS or 2MC engaged in any meaningful business activities. Both were in essence "incorporated pocketbooks" through which Greg channeled funds in an effort to conceal LNI's identity as the source. GVS and 2MC had numerous bank and brokerage accounts, and their financial records were introduced into evidence at trial.

The banking records showed that Greg had siphoned more than $30 million out of LNI to purchase assets for himself and his wife. Roughly 70% of the assets thus purchased consisted of luxury jewelry—mostly women's jewelry—including bracelets, necklaces, diamond rings, and watches designed by Chopard, Patek Philippe, and Rolex.

When purchasing jewelry, Greg (or his employee) would often create fictitious invoices from LNI's suppliers. Greg would wire funds from LNI to a bank account in the name of 2MC or GVS, supposedly in payment of these invoices. Greg or Karla would then write checks on these accounts to jewelry vendors. Criminal investigators analyzed these checks and bank transfers and ascertained that Greg used LNI's funds to acquire more than $22 million in jewelry during 2003–2006.

Greg needed a safe place to store all this jewelry. He directed an employee to build a "secret room" at LNI's headquarters in Latrobe. The secret room was described as "a corner of another room that had been walled off with cinder block." To enter the room an individual had to walk through "a small metal door, lift a rug, and crawl." Criminal investigators executed a search warrant and found in the room commercial grade safes stocked with gemstones, necklaces, watches, bracelets, and diamond rings, as well as filing cabinets cataloging each piece.

---

[2] Greg created several partnerships related to 2MC; for convenience we refer to all of these related entities as "2MC."

[*6] Needless to say, LNI's board of directors did not know about this secret room or its contents.

Greg also used company funds to purchase real estate that he diverted to his personal use. In 2002 the board of directors approved an expansion of the Latrobe bottling plant; the new facilities included ample space for conference rooms and employee offices. But Greg insisted that LNI also purchase a 4.7-acre plot of land (Lot 21) in Ligonier. This property was 12 miles from the bottling plant, but it was adjacent to petitioners' primary residence. LNI never listed Lot 21 as a corporate asset on its financial statements. The property was zoned for residential (not commercial) use; at no time did Greg or LNI seek to change its zoning.

In 2003 LNI transferred Lot 21 to petitioners for $1. At trial Ms. Huet credibly testified that the board of directors never approved this transfer. Greg cross-examined Ms. Huet and showed her board meeting notes that purported to grant approval. Ms. Huet reiterated that the board never approved the proposal and that the document in question appeared to be one of many "board document[s] that [Greg] altered."

Later that year petitioners applied for, and received, a building permit to construct on Lot 21 a 12,071-square-foot single-family house. They hired an architect and a general contractor known in the area for undertaking "high-end residential projects." One of the invoices referred to the property as the "Podlucky Gate House." The architects and contractors were generally paid by checks drawn on 2MC or GVS bank accounts. The house was described as a "mansion" with six bedrooms and nine baths.

CID also discovered that Greg was an avid collector of toy trains, preferring the Lionel brand. In 2005 and 2006 Greg used LNI's funds to purchase Lionel trains from a variety of vendors, including Toy Trains Unlimited, Nicholas Smith Trains, Eastside Trains, and the Train Engineer. In 2005 he placed orders totaling $1,066,628, and in 2006 he placed orders totaling $76,662. He typically purchased two of each item, leaving one in its original packaging to preserve it in mint condition. He stored the model trains in LNI's warehouse. LNI's board of directors had no knowledge of, and did not approve, these purchases.

Finally, CID questioned a $10,772 college tuition payment for petitioners' son, Jesse Podlucky. In 2004 Jesse attended Saint Vincent College. On May 3, 2004, Greg wired $750,000 from LNI to one of 2MC's

[*7] bank accounts. Five days later, Karla drew a check on 2MC's account for $10,772, payable to Saint Vincent College. This covered two semesters of tuition, a parking ticket assessed by the school, and other miscellaneous fees.

In September 2009 Greg was indicted on counts of mail fraud, conspiracy to commit money laundering, and attempting to evade or defeat tax in violation of section 7201. The tax charges were based on his failure to report roughly $35 million of income, in the form of constructive distributions from LNI. Greg pleaded guilty to one count of tax evasion (for 2005), as well as one count of conspiracy and mail fraud. He was sentenced to 20 years' imprisonment.

Karla was indicted on counts of money laundering and conspiracy to commit money laundering. The Government alleged that Karla sold jewelry during the investigation and attempted to conceal the proceeds in trusts and shell companies. She was tried in the U.S. District Court for the Western District of Pennsylvania. In November 2011 she was found guilty of money laundering and sentenced to 51 months' imprisonment. Her conviction was affirmed on appeal. *See United States v. Podlucky*, 567 F. App'x 139 (3d Cir. 2014).

The Government called Brent Nestor to testify as a witness during Karla's criminal trial. At that time Mr. Nestor served as senior vice president of sales for Van Cleef & Arpels (VCA), working in the company's New York office. Mr. Nestor testified about Greg's jewelry purchases from VCA, explaining that most of the jewelry was custom made for Karla. To enable these orders to be filled, Mr. Nestor traveled to Pennsylvania to take Karla's measurements so that rings, bracelets, and necklaces could be sized to fit her exactly.

Mr. Nestor testified that Greg "was quite specific about making the pieces a certain size to fit his wife" and that Karla had personally confirmed her own jewelry preferences. He recalled Karla's writing in one email that she "like[s] the stones to be the center stars," that "diamond encrusted bangles are not comfortable," and that she "like[s] simple, classic, tailored designs." With respect to a special "diamond wedding band" request, Mr. Nestor emailed Greg saying that VCA's

**[\*8]** "designer has revised several proposals because we want to make sure the motifs around the ring are comfortable for Mrs. P to wear."[3]

If petitioners had a particularly unique or special request, Mr. Nestor would refer it to Lily Vongwattanakit, VCA's director of gem purchasing and special orders. Her role was to discuss the request with the client, take measurements, and send the relevant information to VCA's headquarters in Paris. Ms. Vongwattanakit credibly testified during the Tax Court trial that she met with petitioners to discuss their special requests and take Karla's measurements. Ms. Vongwattanakit testified that she had placed a number of these special orders for petitioners. Petitioners purchased so much jewelry from VCA that its employees called their orders the "Podlucky Collection."

Petitioners also worked closely with Angela Patin, a sales representative for Traditional Jewelers. Ms. Patin credibly testified during the Tax Court trial that Greg generally placed the orders but that the jewelry "was mostly for Karla." The jewelry included custom made rings, earrings, bracelets, and necklaces. Ms. Patin credibly testified that she took Karla's measurements so that the jewelry could be sized to fit her exactly.

III. *IRS Examination and Tax Court Proceedings*

Following petitioners' criminal investigation, the IRS in 2012 initiated a civil examination of their 2003–2006 joint Federal income tax returns. For these years petitioners reported between $350,000 and $600,000 of income. The case was assigned to Revenue Agent (RA) Lisa Gaiser. RA Gaiser reconstructed petitioners' income by reviewing bank records, checks, invoices, and other documents obtained during the criminal investigation. She also relied on the prosecution report that underlay the Government's criminal tax evasion charges. Evaluating this information, RA Gaiser determined that petitioners had received

---

[3] Respondent filed a Motion in Limine requesting that Mr. Nestor's prior testimony be admitted under Rule 804(b)(1) of the Federal Rules of Evidence. That provision provides an exception to the hearsay rules when the declarant is unavailable, the testimony was given "at a trial," and the testimony is "now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1). Mr. Nestor resides in Switzerland and was unavailable at the time of the Tax Court trial. By Order served October 21, 2021, we granted respondent's motion.

[*9] unreported income during 2003–2006, in the form of constructive distributions from LNI, as follows:

| Year | Jewelry | Lot 21 | Trains | Tuition | Total |
|---|---|---|---|---|---|
| 2003 | $6,086,621 | $347,071 | — | — | $6,433,692 |
| 2004 | 4,552,786 | 3,322,063 | — | $10,772 | 7,885,621 |
| 2005 | 2,150,637 | 3,899,182 | $1,066,628 | — | 7,116,447 |
| 2006 | 9,959,935 | 3,418,351 | 76,662 | — | 13,454,948 |
| **Total** | **$22,749,979** | **$10,986,667** | **$1,143,290** | **$10,772** | **$34,890,708** |

RA Gaiser then calculated petitioners' taxable income using the rules set forth in section 301. It provides that distributions from a C corporation are taxable as dividends to the extent of the corporation's earnings and profits (E&P). *See* §§ 301(c)(1), 316(a). If distributions exceed E&P, they are nontaxable returns of capital to the extent of the shareholder's basis in his stock. *See* § 301(c)(2). Distributions in excess of basis are taxed as capital gain. *See* §§ 301(c)(3), 1001(a).

Setting aside LNI's fictitious financial statements, RA Gaiser determined that the company actually had zero E&P during 2003–2006. She determined that Greg had $3,354,021 of basis in his LNI stock, so a portion of the 2003 distribution constituted a nontaxable return of capital. She determined that a dividend of $93,500, which petitioners reported as having been paid by LNI in 2004, should be recharacterized as capital gain given the absence of E&P. RA Gaiser accordingly determined for each year additional income in the form of long-term capital gain, producing deficiencies (after other minor income adjustments) and civil fraud penalties (against Greg only) as follows:

| Year | Capital Gain | Deficiency | Fraud Penalty |
|---|---|---|---|
| 2003 | $3,079,671 | $476,123 | $357,092 |
| 2004 | 7,979,121 | 1,189,550 | 892,163 |
| 2005 | 7,116,447 | 1,091,254 | 818,441 |
| 2006 | 13,454,948 | 2,024,775 | 1,518,581 |
| **Total** | **$31,630,187** | **$4,781,702** | **$3,586,277** |

[*10] In April 2012 RA Gaiser prepared Form 11661, Fraud Development Recommendation–Examination. On that form she recommended that the IRS assert against Greg fraud penalties under section 6663 for 2003–2006. She forwarded the case file to Renee Zaffino, her supervisor. Ms. Zaffino signed the form on April 23, 2012, as RA Gaiser's "Group Manager." Susan Harper, an IRS fraud technical advisor, signed the Form 11661 on May 14, 2012.

On March 22, 2013, RA Gaiser sent petitioners a 30-day letter. She attached to that letter Form 4549–A, Income Tax Discrepancy Adjustments. These documents communicated to Greg that the IRS proposed to assert fraud penalties against him.

On November 21, 2016, the IRS issued petitioners a notice of deficiency for 2003–2006. The notice determined deficiencies totaling $4,781,702 and fraud penalties against Greg totaling $3,586,277. Petitioners timely petitioned this Court, proceeding pro se.

Throughout these proceedings petitioners have refused to cooperate with respondent in preparing this case for trial. They refused to stipulate a single document, and they refused to stipulate undisputed facts, both in violation of Rule 91(a)(1). By Order served July 15, 2021, we granted respondent's Motion to deem certain facts, documents, and information established for purposes of this case. *See* Rule 91(f).

Greg has advanced many frivolous arguments and submitted filings plainly intended to delay these proceedings: He has challenged the income tax as unconstitutional; he has asserted that we lack personal and subject matter jurisdiction over him; and he has demanded that we award him $22 billion in damages for operating as a "Star Chamber Court."[4] Greg has filed ten improper appeals from our interlocutory orders.[5]

---

[4] Petitioners improperly attached "exhibits" and other documentary evidence to their post-trial briefs. By Order served March 23, 2022, we struck these "exhibits" from the record. We explained that the record had been closed since October 2021 and that documents cannot be "interjected into the record as attachments to pleadings or briefs." We did not consider these documents when preparing this opinion.

[5] Greg initially filed these interlocutory appeals in the U.S. Court of Appeals for the Third Circuit. After the Department of Justice moved to enjoin him from filing any more frivolous appeals, he began filing appeals in the U.S. Court of Appeals for the Ninth Circuit.

**[\*11]** Several days before trial Greg filed 3,800 pages of documents. One of these filings included amended joint Federal income tax returns for 2003–2006. These amended returns, which were signed by petitioners,[6] reported all the additional income determined in the notice of deficiency. In an attachment petitioners explained that "we are amending our 2003, 2004, 2005 and 2006 tax returns . . . to include all the audit adjustments as determined by [the IRS]."

Petitioners alleged that the sentencing court had ordered Greg to pay restitution of $660 million, that certain of their assets had been forfeited, and that they were allowed loss deductions that would completely offset the deficiencies determined by the IRS. They asserted that they were therefore "rescinding" their petitions, that no trial should be held, and that this case should be dismissed.

We informed petitioners that, unless they wished to make a full concession, the case would proceed to trial. We explained "that in deficiency cases brought pursuant to section 6213 a taxpayer may not withdraw a petition in order to avoid a decision." *Davidson v. Commissioner*, 144 T.C. 273, 274 (2015); *Estate of Ming v. Commissioner*, 62 T.C. 519, 521 (1974) ("[A] taxpayer may not unilaterally oust the Tax Court from jurisdiction which, once invoked, remains unimpaired until it decides the controversy."). Under Rule 123(d), dismissal of a case, other than a dismissal for lack of jurisdiction, "shall operate as an adjudication on the merits." Thus, if we were to dismiss this case as petitioners suggested, we would be required to enter a decision against them in the full amounts of the deficiencies and penalties determined in the notice of deficiency. The case accordingly proceeded to trial.

OPINION

I.    *Unreported Income*

Section 61(a) provides that "gross income means all income from whatever source derived." In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer to the income-producing activity, *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977), or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982). Once the Commissioner has met his threshold burden, the burden shifts to the taxpayer to show

---

[6] Karla signed the amended returns as "Innocent Spouse KSP."

**[\*12]** that the Commissioner's determinations are arbitrary or erroneous.[7]  *See Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97; *Anastasato v. Commissioner*, 794 F.2d 884, 887–88 (3d Cir. 1986), *vacating and remanding* T.C. Memo. 1985-101.

To satisfy his burden respondent produced extensive bank records, invoices, checks, and receipts gathered during the criminal and civil examinations.  During petitioners' criminal investigation the Government discovered a "secret room" in LNI's office building, which contained jewelry worth well in excess of $22 million.[8]  The documents introduced into evidence at trial showed that Greg used roughly $11 million of LNI's funds to finance his Lot 21 construction project and spent $1 million on his toy train collection.  During 2003–2006 Greg made these personal expenditures by writing checks on LNI's accounts and by wiring money from LNI to one of the shell companies he controlled.

The IRS computed the deficiencies for 2003–2006 by reviewing these records in conjunction with the Government's prosecution report.  The IRS ultimately determined that Greg, as LNI's majority shareholder, received from it constructive distributions of almost $35 million.  Respondent has clearly supplied a threshold evidentiary foundation connecting petitioners to unreported income.  *See Petzoldt v. Commissioner*, 92 T.C. 661, 687 (1989) (holding that the IRS has great latitude in reconstructing a taxpayer's income, and the reconstruction "need only be reasonable in light of all surrounding facts and circumstances").

Petitioners thus bear the burden of proving that respondent's determinations of unreported income, as set forth in the notice of deficiency, are "arbitrary or erroneous."  *See Hardy*, 181 F.3d at 1004; *Anastasato*, 794 F.2d at 887–88.  Petitioners' submissions have not been a model of clarity.  Early in the case they insisted that the income tax laws are unconstitutional.  More recently they submitted copies of amended returns reporting all the income determined in the notice of deficiency.

---

[7] Petitioners assert that the RA lacked authority under section 7608 and that the evidence introduced at trial is "poisoned fruit of the poisonous tree."  This is a frivolous argument.  Section 7608, which governs certain criminal enforcement actions, does not limit the Commissioner's authority to conduct civil examinations under section 6201, determine deficiencies under section 6212, or collect taxes under section 6301.

[8] The criminal investigators actually discovered $33,972,473 of jewelry in the "secret room."  But the IRS determined that only $22,749,979 worth of jewelry had been constructively distributed to petitioners during the 2003–2006 tax years at issue.

**[\*13]** These returns could be taken as admissions by petitioners that those unreported income numbers are correct. *See Badaracco v. Commissioner*, 464 U.S. 386, 399 (1984) ("An amended return, of course, may constitute an admission . . . ."); *Lare v. Commissioner*, 62 T.C. 739, 750 (1974) ("Statements made in a tax return signed by a taxpayer may be treated as admissions."), *aff'd*, 521 F.2d 1399 (3d Cir. 1975).

At trial petitioners focused much attention on the IRS's computations, questioning where the IRS "g[o]t the underpayment numbers from." In their post-trial brief they assert that these numbers "were never corroborated, sustained, and detailed." But petitioners presented nothing credible to rebut the overwhelming amount of evidence linking them to unreported income. They have submitted nothing but general denials, which are "insufficient to meet [their] burden of nonpersuasion." *Anastasato*, 794 F.2d at 888.

Petitioners appear to contend that the IRS had the burden of producing evidence to prove (for example) that the jewelry petitioners purchased during 2003–2006 was worth $22,749,979. If that is petitioners' argument, it is misconceived. Once the Commissioner produces evidence linking taxpayers to unreported income—as respondent did—taxpayers have the burden of proving that the IRS's determinations of unreported income are "arbitrary and erroneous." *Id.* at 887; *see Keogh v. Commissioner*, 713 F.2d 496, 502 (9th Cir. 1983) (holding that the taxpayers failed to prove that the Commissioner's estimates were arbitrary or erroneous where they advanced general denials and "self-serving testimony"). Petitioners have not carried this burden; indeed, they made no genuine effort at trial to do so.

Petitioners alternatively contend that the assets they purchased were acquired for LNI's benefit, not for their own. Greg testified that he purchased luxury jewelry because LNI was "diversifying [its] product lines" and "dealing with Tibetan monks in Asia" who "want[ed] hard assets" rather than cash. According to Greg, the monks had access to valuable species of tea, which LNI wished to acquire by using jewelry in "bartering transactions."

This testimony was utterly implausible. Greg was unable to tell the Court where the putative monks resided or confirm that the country in which they lived produced tea. He could not explain why the monks would prefer jewelry to the U.S. dollar as a medium of exchange. He could not explain why Buddhist monks would be eager to acquire women's jewelry, particularly jewelry that was sized to fit Karla's wrist,

14

[*14] neck, and ring finger. And he could not explain why $22 million of jewelry, if an asset of LNI, was neither shown on its balance sheet nor brought to the attention of its directors.

Greg's testimony about Lot 21 was no more persuasive. He insisted that the "Podlucky Gate House," situated on land zoned for residential use, was intended to be used as a "training facility" for LNI's staff. He could not explain why LNI would have chosen to build an employee training facility next door to his house, 12 miles away from the production facility in Latrobe. He could not explain why LNI needed a separate training center, when its Latrobe facility had recently been expanded to include ample space for conference rooms and employee offices. He asserted that more space was needed for "300 new sales representatives," but he supplied no evidence that LNI ever considered hiring 300 new workers, which would have quadrupled its workforce. He could not explain why a training facility would have been configured as a six-bedroom, nine-bath mansion. And he could not explain why, if the house really was a training facility for LNI, Lot 21 was transferred to him personally for $1, without board approval.[9]

Petitioners offered little testimony about the model train collection, apart from Greg's assertion that the trains were intended for use in a company "marketing campaign." But he offered no evidence that LNI had ever considered such a campaign, no evidence as to who was supposed to conduct it, and no explanation as to how model trains could usefully be deployed to advertise tea-flavored beverages. Assuming arguendo that they could be so used, Greg could not explain why it was necessary to acquire $1.1 million worth of model trains, including duplicates of each item.[10]

---

[9] Karla testified, in the alternative, that the Podlucky Gate House was intended for use by religious missionaries whom she admired. We did not find that testimony credible. In any event, that would have been a personal use, as opposed to a business use of the company, and the Lot 21 expenditures would still be constructive distributions. *Cf. Magnon v. Commissioner*, 73 T.C. 980, 994 (1980) ("The crucial test of the existence of a constructive dividend is whether 'the distribution was primarily for the benefit of the shareholder.'").

[10] Greg contended that LNI must have "owned" the model trains because the bankruptcy court ultimately directed that they be sold for the benefit of creditors. The conclusion does not follow from the premise. Greg extracted $35 million from LNI at a time when he was defrauding LNI's lenders and minority shareholders. Under these circumstances, the bankruptcy trustee attempted to recoup what he could from the assets Greg had wrongfully acquired. But this does not negate Greg's receipt of gross

**[\*15]** Petitioners also contested the taxability of the $10,772 tuition payment. At trial they asserted that this represented a stipend their son earned for completing an internship with LNI. But they presented no evidence of an internship agreement; no evidence that LNI's board of directors approved any internship or scholarship program; and no evidence that LNI benefited from their son's services. Nor could petitioners explain why the tuition (plus a parking ticket and other fees) was paid out of Greg's shell company by Karla, who was not an officer of LNI. In any event, even if LNI were thought to have derived some benefit from the son's participation in a college internship, petitioners have not shown why such a payment—which relieved them of their own tuition obligation—would be nontaxable. *Cf. Hacker v. Commissioner*, T.C. Memo. 2022-16, at \*17 (ruling that a shareholder "must include in gross income payments the corporation made on the shareholder's behalf").

In the alternative petitioners contend that they are entitled, under section 165, to loss deductions that completely offset the income determined in the notice of deficiency. They allege that the sentencing court ordered Greg to pay $660 million of restitution and that certain of their assets were forfeited to the Government following their convictions in 2011. "Property forfeited pursuant to a taxpayer's guilty plea," they say, "is properly characterized as a loss item."

This argument fails for at least three reasons. First, petitioners have not properly raised this issue. They did not claim section 165 deductions on their original returns, and they did not mention section 165 in the Petition. *See* Rule 34(b)(4) ("Any issue not raised in the . . . [petition] shall be deemed to be conceded."). Rather, they advanced this new argument one month before trial, in a filing in which they referred to themselves as "Former Petitioners." They asserted that the purported loss deductions obviated the need for trial, demanding that their Tax Court Petition be "withdrawn" or "rescinded." They did not submit a pre-trial memorandum, so respondent had no reason to believe that section 165 deductions were actually at issue in this case. To permit petitioners to raise this issue in a post-trial brief, after the trial record closed, would be prejudicial to respondent. *See Seligman v.*

---

income in the year the property was constructively distributed to him. This resembles the embezzlement scenario: The fact that an embezzler repays the funds in a later year does not negate his receipt of gross income in the year of the embezzlement. *See Yerkie v. Commissioner*, 67 T.C. 388, 390 (1976) ("Although the proceeds of an embezzlement are not obtained lawfully, they result in economic gains for the embezzler and, as such, are included in his gross income for the year in which the funds were misappropriated." (citing *James v. United States*, 366 U.S. 213 (1961))).

**[\*16]** *Commissioner*, 84 T.C. 191, 199 (1985) (finding prejudice where opposing party had no opportunity to present evidence on issue that was not raised in the pleadings), *aff'd*, 796 F.2d 116 (5th Cir. 1986).

In any event, petitioners have failed to prove that they are entitled to loss deductions. Section 165(a) permits a taxpayer to deduct "any loss sustained during the taxable year" if "not compensated for by insurance or otherwise." Assuming arguendo that Greg was ordered to pay restitution, petitioners offered no evidence that he actually made restitution payments or (if so) how much restitution he paid. And while petitioners assert that their property was forfeited, they offered no evidence to establish which assets were forfeited or the value of such property.

Finally, petitioners have not established that they sustained any loss during the tax years at issue, i.e., during 2003–2006. *See* Treas. Reg. § 1.165-1(d)(1) (providing that loss deductions are allowed "for the taxable year in which the loss is sustained"). To the contrary, their alleged losses would have occurred (if at all) after 2006, when assets were allegedly "forfeited pursuant to [Greg's] guilty plea" or when restitution ordered by the sentencing court was allegedly paid. *See Stephens v. Commissioner*, 905 F.2d 667, 671 (2d Cir. 1990) (noting that taxpayers who repay embezzled funds might be "entitled to a deduction in the year in which the funds are repaid"), *rev'g* 93 T.C. 108 (1989); *Norman v. Commissioner*, 407 F.2d 1337, 1338 (3d Cir. 1969) (per curiam) (noting that "restitution [paid] in a subsequent year might provide a proper basis for a deduction allowable in that year"), *aff'g* T.C. Memo. 1968-40; Treas. Reg. § 1.6001-1(a) (requiring taxpayers to identify the deduction, show that they have met all relevant requirements, and keep books or records to substantiate the amounts claimed).

II.  *Fraud Penalties*

Section 6501(a) generally requires the IRS to assess a tax within three years after the return was filed. The period of limitations is extended to six years where the taxpayer omits from gross income an amount "in excess of 25 percent of the amount of gross income stated in the return." § 6501(e)(1)(A)(i). The notice of deficiency in this case was issued on November 21, 2016, more than six years after the period of limitations began to run for 2006, the last year at issue.

However, section 6501(c)(1) provides that, where a taxpayer has filed "a false or fraudulent return with the intent to evade tax," there is

**[\*17]** no period of limitations, and the tax "may be assessed . . . at any time." In the case of a joint return, fraud by either taxpayer suspends indefinitely the period of limitations for both taxpayers. *Vannaman v. Commissioner*, 54 T.C. 1011, 1018 (1970); s*ee Richardson v. Commissioner*, 509 F.3d 736, 745 (6th Cir. 2007) (holding that fraud by one spouse "lifts the statute of limitations" for both), *aff'g* T.C. Memo 2006-69; *Ballard v. Commissioner*, 740 F.2d 659, 663 (8th Cir. 1984) (same), *aff'g in part, rev'g in part* T.C. Memo 1982-466.

"[T]he determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663 . . . ." *Neely v. Commissioner*, 116 T.C. 79, 85 (2001). Whether the underpayments at issue were due to fraud thus determines both whether Greg is liable for civil fraud penalties and whether respondent can assess the deficiencies.

A.     *Supervisory Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." As a threshold matter, respondent must show that he complied with section 6751(b)(1). *See Chai v. Commissioner*, 851 F.3d 190, 221 (2d Cir. 2017) (ruling that "compliance with § 6751(b) is part of the Commissioner's burden of production" under § 7491(c)), *aff'g in part, rev'g in part* T.C. Memo. 2015-42.

In *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020), we explained that the "initial determination" of a penalty assessment is typically embodied in a letter "by which the IRS formally notifie[s] [the taxpayer] that the Examination Division ha[s] completed its work and . . . ha[s] made a definite decision to assert penalties." Once the Commissioner introduces evidence sufficient to show written supervisory approval, the burden shifts to the taxpayer to show that the approval was untimely, i.e., "that there was a formal communication of the penalty [to the taxpayer] before the proffered approval" was secured. *Frost v. Commissioner*, 154 T.C. 23, 35 (2020).

Respondent has produced the Form 11661 by which RA Gaiser recommended assertion of fraud penalties against Greg. RA Gaiser's immediate supervisor, Ms. Zaffino, signed that form on April 23, 2012. The recommendation to assert fraud penalties was communicated to

[*18] Greg 11 months later, in a 30-day letter dated March 22, 2013, with an attached Form 4549–A showing the penalty calculation. Respondent has thus met his burden of production by showing timely approval. *See Frost*, 154 T.C. at 35.[11]

### B.    *Existence of Fraud*

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment attributable to fraud. Respondent has the burden of proving fraud, and he must prove it by clear and convincing evidence. *See* § 7454(a); Rule 142(b). To sustain his burden, respondent must establish two elements: (1) that there was an underpayment of tax for each year at issue and (2) that at least some portion of the underpayment for each year was due to fraud. *See Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983).

Where the Commissioner determines fraud penalties for multiple tax years, his burden of proving fraud "applies separately for each of the years." *Vanover v. Commissioner*, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1420 (quoting *Temple v. Commissioner*, T.C. Memo. 2000-337, 80 T.C.M. (CCH) 611, 618, *aff'd*, 62 F. App'x 605 (6th Cir. 2003)). If the Commissioner proves that some portion of an underpayment for a particular year was attributable to fraud, then "the entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that the balance was not so attributable. § 6663(b).

For the reasons stated previously, respondent has carried his burden of proving by clear and convincing evidence that Greg underreported his income and underpaid his tax for 2003–2006. On August 24, 2021, we granted respondent's Motion for Partial Summary Judgment regarding the existence of fraud for 2005. Because Greg was convicted of tax

---

[11] In *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), the Ninth Circuit considered the timeline for obtaining supervisory approval of "assessable penalties," which are not subject to deficiency procedures. The court held that, for an assessable penalty, supervisory approval is timely if secured before the penalty is assessed or "before the relevant supervisor loses discretion whether to approve the penalty assessment." *Id.* at 1074. The court suggested that, in a deficiency case such as this, the deadline for securing supervisory approval would be the issuance of the notice of deficiency. *Id.* at 1071 n.4. If that analysis were adopted here, supervisory approval of the fraud penalties was clearly timely: Approval was secured in April 2012, and the notice of deficiency was not issued until November 2016.

**[\*19]** evasion for that year, he is collaterally estopped from denying that his underpayment for 2005 was due to fraud. *See DiLeo v. Commissioner*, 96 T.C. 858, 885 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *see also Anderson v. Commissioner*, 698 F.3d 160, 164–65 (3d Cir. 2012), *aff'g* T.C. Memo. 2009-44; *United States v. Schiff*, 240 F. App'x 738 (9th Cir. 2006). At trial respondent thus bore the burden of proving that at least some portions of the underpayments for 2003, 2004, and 2006 were due to fraud.

Fraud is intentional wrongdoing designed to evade tax believed to be owing. *Neely*, 116 T.C. at 86. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977). Fraud is not to be presumed or based upon mere suspicion. *Petzoldt*, 92 T.C. at 699–700. But because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. *Id.* at 699. The Commissioner satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Parks v. Commissioner*, 94 T.C. 654, 661 (1990). The taxpayer's entire course of conduct may be examined to establish the requisite intent, and an intent to mislead may be inferred from a pattern of conduct. *Webb v. Commissioner*, 394 F.2d 366, 379 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81; *Stone v. Commissioner*, 56 T.C. 213, 224 (1971).

Circumstances that may indicate fraudulent intent, often called "badges of fraud," include but are not limited to: (1) understating income, (2) keeping inadequate records, (3) giving implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) supplying incomplete or misleading information to a tax return preparer, (8) providing testimony that lacks credibility, (9) filing false documents (including false tax returns), (10) failing to file tax returns, and (11) dealing in cash. *See Schiff v. United States*, 919 F.2d 830, 833 (2d Cir. 1990); *Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601; *Parks*, 94 T.C. at 664–65; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988); *Morse v. Commissioner*, T.C. Memo. 2003-332, 86 T.C.M. (CCH) 673, 675, *aff'd*, 419 F.3d 829 (8th Cir. 2005). No single factor is dispositive, but the existence of several factors "is persuasive circumstantial evidence of fraud." *Vanover*, 103 T.C.M. (CCH) at 1420–21. We conclude that at least eight of these badges demonstrate that Greg acted with fraudulent intent during 2003, 2004, and 2006.

**[*20]**         1.      *Understating Income*

A pattern of substantially understating income for multiple years is strong evidence of fraud, particularly if the understatements are not satisfactorily explained. *See Vanover*, 103 T.C.M. (CCH) at 1421. Greg understated his income by $3,120,163 for 2003, $7,904,784 for 2004, $7,184,409 for 2005, and $13,480,876 for 2006. The volume of this income was extremely large relative to the income that Greg actually reported for each year, which was between $350,000 and $600,000.

During 2003–2006 Greg created false financial records to induce lenders and investors to advance funds to LNI. The Third Circuit stated that Greg's scheme "bilked LNI's investors and banks of more than $628 million." *Podlucky*, 567 F. App'x at 141. He then extracted $35 million of loan proceeds from the company to purchase luxury jewelry and a mansion for himself and his wife. Given the source of this income, the substantial amounts underreported, and Greg's pattern of underreporting, these understatements are persuasive evidence of fraudulent intent.

         2.      *Keeping Inadequate Records*

Greg not only failed to supply adequate records of his assets and income but actively falsified documents during 2003–2006. He told one of his employees "what he wanted [LNI's] sales to be" and directed her to "create fake invoices to support the fictitious sales numbers." Together they fabricated checks, created fictitious bank statements, and generated fraudulent financial statements for LNI. Greg's computer contained "templates" that he used to photoshop bank checks and other documents.

As part of this scheme Greg maintained two sets of books for LNI. He instructed his employee to use two separate software systems: one to track the company's actual results and the other to store the fraudulent accounting records. Needless to say, Greg did not inform LNI's investors, creditors, or outside shareholders that the records he supplied to them were false.

Greg also took steps to conceal LNI's identity as the source of funds used to purchase jewelry and fund the Podlucky Gate House. Most of the payments to jewelers, architects, and contractors were drawn on bank accounts of shell companies under Greg's control, to which he had wired funds from LNI. He fabricated invoices from suppliers to create an illusory justification for these transfers. The

**[\*21]** creation of fictitious records supplies strong evidence of fraudulent intent.

### 3. *Giving Implausible or Inconsistent Explanations*

Greg offered to the IRS and the Court a variety of implausible and inconsistent explanations about his income and assets. At trial he argued that he purchased diamond rings and necklaces, sized specifically for Karla, because LNI was engaging in "barter" transactions with "Tibetan monks in Asia" who "want[ed] hard assets" rather than cash. And he advanced the wholly implausible argument that a six-bedroom, nine-bath mansion was intended to be used as a "training facility" for LNI's employees. As a certified public accountant and CEO of a large corporation, Greg must have known that these theories were untenable.

### 4. *Concealing Income or Assets*

A willful attempt to evade tax may be inferred from a taxpayer's concealment of income or assets. *Spies v. United States*, 317 U.S. 492, 499 (1943). Greg intentionally concealed LNI's true accounting records in a set of books to which only he (and his partners in crime) had access. He falsified LNI's revenues and profits, and he concealed the fact that he was funneling LNI's funds to shell companies to purchase personal assets.

The clearest indication that Greg attempted to conceal assets is that he built a "secret room" to hide assets. He hid more than $20 million of jewelry in this "secret room," tucked away behind a cinderblock wall in LNI's headquarters, which could be entered only by walking through "a small metal door, lift[ing] a rug, and crawl[ing]." Greg's entire course of conduct reveals a deliberate intent to conceal income and assets.

### 5. *Failure to Cooperate with Tax Authorities*

Throughout these proceedings Greg refused to cooperate with respondent in preparing this case for trial. He refused to stipulate undisputed facts and exhibits (e.g., the tax returns that petitioners themselves filed) in violation of Rule 91(a)(1). He made frivolous arguments and submitted filings intended to delay proceedings: He challenged the income tax as unconstitutional; he asserted that the Court lacks personal and subject matter jurisdiction over him; and he demanded that the Court award him $22 billion in damages for operating as a "Star Chamber Court." This obstructive behavior is a badge of fraud. *See*

[*22] *Curtis v. Commissioner*, T.C. Memo. 2013-12, 105 T.C.M. (CCH) 1100, 1104 (holding that the "assertion of frivolous arguments" and "tax-protestor beliefs demonstrate a clear intent to evade" tax), *aff'd*, 648 F. App'x 689 (9th Cir. 2016).

### 6.  *Engaging in Illegal Activities*

During 2003–2006 Greg falsified LNI's financial records to induce investors and lenders to advance funds to the business.  He extracted $35 million from the company to purchase luxury jewelry and a mansion.  In September 2009 he was indicted for multiple crimes and pleaded guilty to tax evasion, mail fraud, and conspiracy.  These illegal activities are definite badges of fraud.  *See Catlett v. Commissioner*, T.C. Memo. 2021-102, at *19; *Le v. Commissioner*, T.C. Memo. 2020-27, 119 T.C.M. (CCH) 1165, 1173.

### 7.  *Lack of Credibility of Taxpayer's Testimony*

We did not find Greg to be a credible witness.  We have noted above numerous specific points on which we found his testimony to lack credibility.  His primary defense—that he purchased inherently personal assets for LNI's benefit—was wholly implausible in the light of the illegal accounting scheme that he concealed from LNI's investors and creditors.

### 8.  *Filing False Documents*

Greg filed false income tax returns for 2003–2006, omitting more than $30 million of gross income.  As a certified public accountant, he must have recognized his obligation to report this income, which enabled his lavish spending and lifestyle.  He also supplied auditors, lenders, and potential investors with fraudulent documents that he fabricated or caused to be fabricated.  These false documents furnish additional evidence of fraudulent intent.

We conclude that respondent has established by clear and convincing evidence that the underpayments of tax for 2003–2006 were attributable to fraud.  Greg did not establish, "by a preponderance of the evidence," that any portions of the underpayments were not attributable to fraud.  *See* § 6663(b).  We thus sustain respondent's determinations that (1) Greg is liable for civil fraud penalties for 2003–2006 and (2) the notice of deficiency for 2003–2006 was timely under section 6501(c)(1).

**[\*23]** III.     *"Innocent Spouse" Relief*

Married taxpayers may elect to file a joint Federal income tax return.  § 6013(a).  After making this election, each spouse is jointly and severally liable for the entire tax due for that year.  § 6013(d)(3); *Butler v. Commissioner*, 114 T.C. 276, 282 (2000).  But in certain circumstances a spouse who has filed a joint return may seek relief from joint and several liability under section 6015.

Section 6015(b) specifies procedures for relief from liability for all joint filers, and subsection (c) specifies procedures to limit liability for taxpayers who are no longer married or are living separately.  Karla is not eligible for relief under subsection (c) because she remains married to, and continues to live with, Greg.[12]  *See* § 6015(c)(3)(A)(i).  However, Karla contends that she meets the requirements of subsection (b).  She bears the burden of proving that she is entitled to relief.  *See* Rule 142(a); *Alt v. Commissioner*, 119 T.C. 306, 311 (2002), *aff'd*, 101 F. App'x 34 (6th Cir. 2004).

Section 6015(b)(1) provides that a requesting spouse shall be relieved of joint and several liability for a particular year if: (1) the requesting spouse filed a joint return, (2) the return contains an understatement of tax attributable to an erroneous item of the nonrequesting spouse, (3) the requesting spouse did not know and had no reason to know about the understatement, (4) it would be inequitable to hold the requesting spouse liable for the deficiency attributable to the understatement, and (5) the requesting spouse's claim for relief is timely.  Failure to meet any one of these requirements precludes relief under section 6015(b).  *Alt*, 119 T.C. at 313.  We find that Karla does not meet the second, third, or fourth requirement.

A.     *Whether the Understatement is Attributable to Karla*

A requesting spouse is not eligible for relief under section 6015(b) if the understatement of tax is attributable to her own erroneous items.  § 6015(b)(1)(B).  In this case the understatements arose out of Greg's extraction of funds from LNI, which he used to finance his and Karla's lavish lifestyle.  Although Greg directed the scheme, causing LNI to make constructive distributions of property, Karla played a crucial role.

---

[12] Although Greg was sentenced to 20 years' imprisonment, he was evidently released early.  Greg and Karla now share an address in Colorado, and they appeared together for the remote trial.

**[*24]** Karla had signature authority over the bank accounts of 2MC, a shell company that Greg deployed to carry out his fraud. One step in the arrangement involved Greg's wiring money from LNI to 2MC. Karla would then draw money from 2MC's accounts to purchase jewelry and to pay for services related to the Podlucky Gate House.

During 2003–2006 Karla signed at least 100 checks on behalf of 2MC. The amounts ranged from $60 to $500,000, and the checks were made out to her, Greg, Traditional Jewelers, Blackstone Fine Jewelers, Fine Gems International, and VCA, as well as architects and contractors involved in the Lot 21 construction. Karla signed at least $6,628,139 in checks during these years. These payments far exceeded the total income that petitioners reported on their joint returns for 2003–2006, which was between between $350,000 and $600,000 annually.

At trial Karla conceded that some of the jewelry belonged to her. She stated that Greg had purchased the jewelry after securing a $5 million investment for LNI in 2000, and that she "assumed [all the jewelry] was being purchased with that $5 million." She argued that respondent "never differentiated between [her] personal jewelry and the investment jewelry for Le-Nature's."

We did not find this line of argument persuasive. As the person seeking relief from joint and several liability, Karla bears the burden of proving that she is entitled to relief. *See* Rule 142(a); *Alt*, 119 T.C. at 311. Petitioners did not carry their burden to prove that any of the jewelry was "investment jewelry" purchased for LNI's benefit. In any event, it was Karla's responsibility, not respondent's, to "differentiate[] between [her] personal jewelry and the investment jewelry." She did not produce any documents or other information that could enable the Court to determine which (if any) pieces were actually purchased as an investment for LNI.

While Karla may not have acted with fraudulent intent, the evidence shows that the ill-gotten gains were attributable to her, at least in part. She signed more than 100 checks on behalf of 2MC. These checks, made out to jewelry vendors, architects, and contractors, totaled more than $6 million and benefited her personally. We conclude that Karla has failed to establish that any portion of the understatements is not attributable to her.

[*25]  B.    *Knowledge or Reason to Know*

Section 6015(b)(1)(C) provides that a requesting spouse may be eligible for relief if she establishes that "she did not know, and had no reason to know," about the understatement of tax.  The "reason to know" test is subjective.  *See Butler*, 114 T.C. at 284.  We consider several factors, including the requesting spouse's involvement in the events leading to the understatement and the existence of expenditures that are "lavish or unusual when compared to the family's past income levels." *Ibid.*

As explained above, Karla was directly involved in the transactions that led to the understatements of tax, because she signed more than $6 million of checks to jewelry vendors and contactors working on their mansion.  At trial Karla downplayed her role.  Although she acknowledged that she had signed many checks, she said that Greg was "very secretive" and that she did not "kn[o]w the extent of his purchases."  She said that she had no "social life outside of church" and "would never ostentatiously wear the sort of pieces [of jewelry] that Greg Podlucky was buying."  She testified that, because Greg had stashed most of the jewelry in LNI's secret room, she thought that the jewelry belonged to LNI.

We did not find this testimony credible.  VCA's senior vice president of sales (Mr. Nestor) and VCA's director of gem purchasing and special orders (Ms. Vongwattanakit) both testified that they had traveled to Pennsylvania specifically to take Karla's measurements.  Indeed, Mr. Nestor testified that Greg "was quite specific about making the pieces a certain size to fit his wife."  After sizing Karla's neck, fingers, and wrists, Mr. Nestor and Ms. Vongwattanakit helped petitioners design custom made diamond rings, earrings, bracelets, and necklaces.  Petitioners ordered so much jewelry that VCA's employees referred to their stash as the "Podlucky Collection."

Although Greg served as VCA's main point of contact, Mr. Nestor received emails in which Karla specified her jewelry preferences.  She wrote in one email that she "like[s] the stones to be the center stars," that "diamond encrusted bangles are not comfortable," and that she "like[s] simple, classic, tailored designs."  These are not the observations of a spouse who did not "kn[o]w the extent of [her husband's] purchases."

Ms. Patin, a sales representative for Traditional Jewelers, similarly testified about her business relationship with petitioners.  She

[*26] credibly testified that petitioners ordered custom made rings, earrings, bracelets, and necklaces for Karla and that she took Karla's measurements so that the jewelry could be sized to fit her exactly. Although Greg at times ordered men's watches, Ms. Patin testified that the jewelry "was mostly for Karla." During 2003–2006 Karla signed at least 20 checks to Traditional Jewelers, totaling more than $1,900,000.

These jewelry purchases alone vastly exceeded the income that petitioners reported for 2003–2006, which ranged between $350,000 and $600,000. These expenditures were plainly "lavish or unusual when compared to the family's past income levels." *Butler*, 114 T.C. at 284. Considering her husband's purported income, a reasonable person in her position would have questioned their ability to buy all this jewelry, not to mention an $11 million mansion. *See Price v. Commissioner*, 887 F.2d 959, 965 (9th Cir. 1989) (discussing the requesting spouse's "duty of inquiry"). As we have repeatedly held, "[s]ection 6015 does not protect a spouse who turns a blind eye to facts readily available to her." *Porter v. Commissioner*, 132 T.C. 203, 212 (2009); *see Guth v. Commissioner*, 897 F.2d 441, 444 (9th Cir. 1990) (noting that in unreported income cases the requesting spouse must show that "she had no knowledge of the transactions leading to the understatement"), *aff'g* T.C. Memo. 1987-522. For all these reasons we conclude that Karla knew or should have known, when signing the 2003–2006 returns, that the returns significantly understated their tax.[13]

## C. *Equitable Considerations*

Under section 6015(b)(1)(D), a requesting spouse may be eligible for relief if she establishes, based on "all the facts and circumstances," that it would be "inequitable" to be held liable for the tax. "[T]he equitable factors we consider[] under section 6015(b)(1)(D) are the same equitable factors we consider under section 6015(f)." *Alt*, 119 T.C. at 316. We generally consider: (1) marital status, (2) economic hardship, (3) significant benefit, (4) subsequent compliance with Federal tax laws, (5) legal obligation to pay the outstanding tax liability, (6) knowledge or reason to know about the understatement, and (7) mental or physical health. *See* Rev. Proc. 2013-34, § 4.03(2), 2013-43 I.R.B. 397, 400–03 (listing these seven factors for consideration in determining whether

---

[13] This is not a case where Karla's knowledge is "negated" because of spousal abuse or lack of access to household finances. *Cf. Robinson v. Commissioner*, T.C. Memo. 2020-134, 120 T.C.M. (CCH) 217, 224 (concluding that the spouse's knowledge was negated because her husband "prevented [her] from questioning the payment of tax reported as due").

**[\*27]** equitable relief should be granted under section 6015(f)); *see also* Treas. Reg. § 1.6015-2(d).[14]

We find that five of these factors are neutral. But the third and sixth factors weigh heavily against relief. As explained above, Karla knew or had reason to know about the understatements of tax. And she also derived a "significant benefit" from those understatements.

The "significant benefit" factor requires the Court to consider whether the requesting spouse benefited in excess of normal support. *See Robinson*, 120 T.C.M. (CCH) at 224; Rev. Proc. 2013-34, § 4.03(2)(e), 2013-43 I.R.B. at 402. If the understatement enabled the requesting spouse to purchase "luxury assets" or live a "lavish lifestyle," then this factor weighs against relief. Rev. Proc. 2013-34, § 4.03(2)(e), 2013-43 I.R.B. at 402; *see Alt*, 119 T.C. at 314 (finding that the requesting spouse benefited from the understatement where it enabled her to pay for land, antiques, and her child's college tuition).

Petitioners understated their income by $3,120,163 for 2003, $7,904,784 for 2004, $7,184,409 for 2005, and $13,480,876 for 2006. These understatements enabled them to purchase massive amounts of luxury jewelry and an $11 million mansion. These were plainly "luxury assets" incident to a "lavish lifestyle," and Karla failed to prove that Greg made all these spending decisions. *See* Rev. Proc. 2013-34, § 4.03(2)(e). Indeed, Karla herself issued more than $6 million in checks to jewelry vendors and contractors. We find that the "significant benefit" factor weighs heavily against relief.

In sum, we conclude that the "reason to know" and "significant benefit" factors cut decisively against Karla's claim for relief under section 6015(b). No equitable factor (from the revenue procedure or otherwise) weighs in favor of relief. Weighing these seven factors, we conclude that Karla has failed to carry her burden of proving that it would be "inequitable" to be held liable for the tax. Karla is therefore not eligible for relief under section 6015(b). *See Alt*, 119 T.C. at 313 (noting that the section 6015(b)(1) requirements are "conjunctive," and "a

---

[14] Rev. Proc. 2013-34, which modified and superseded Rev. Proc. 2003-61, 2003-2 C.B. 296, applies to requests for equitable relief under section 6015(f) that were filed on or after September 16, 2013. Although we are not bound by the guidelines set forth in Rev. Proc. 2013-34, we consult those guidelines in considering whether a taxpayer is entitled to equitable relief under section 6015(f). *See Pullins v. Commissioner*, 136 T.C. 432, 438–39 (2011).

**[*28]** failure to meet any one of them prevents a requesting spouse from qualifying for relief").[15]

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant or meritless.

To implement the foregoing,

*Decision will be entered for respondent.*

---

[15] Karla did not argue that she is eligible for relief under section 6015(f). But even if she had, her claim would fail for several reasons. First, Rev. Proc. 2013-34, which specifies the procedures governing equitable relief under section 6015(f), sets forth seven "threshold conditions" that a requesting spouse must satisfy to be eligible for relief. Rev. Proc. 2013-34, § 4.01, 2013-43 I.R.B. at 399–400. Karla cannot satisfy the seventh condition, which requires that the tax liability be attributable to an item of the non-requesting spouse. *See supra* pp. 23–24. Assuming arguendo that Karla could surmount this threshold hurdle, her claim for equitable relief would fail for the reasons discussed in the text.